STATE OF HAWAII, Plaintiff-Appellee *v.* JAMES POKINI, also known as James K. Pokini, Defendant-Appellant

NO. 5673

APRIL 7, 1976

RICHARDSON, C.J., KOBAYASHI, OGATA AND MENOR, JJ., AND CIRCUIT JUDGE SHINTAKU ASSIGNED BY REASON OF VACANCY

18

OPINION OF THE COURT BY MENOR, J.

The defendant, James Pokini, was indicted jointly with Franklin Melandre and Jonah Iaea on two counts, one for conspiracy to murder Harold "Biggie" Chan and the other for his murder in the first degree. Franklin Melandre was tried separately in August, 1973. The defendant and Jonah Iaea were tried together in April, 1974, after their motions for severance were denied. The defendant was acquitted of murder in the first degree but was found guilty by a jury of the offense of conspiracy to murder. The defendant appeals from the judgment and sentence of the trial court.

We reverse the conviction and set aside the judgment and sentence of the circuit court.

I

At the earlier separate trial of Franklin Melandre, a material witness for the prosecution was one Robert Low, an admitted accomplice. He was also a principal State witness against the defendant and Iaea in this case. Low testified that he and Pokini planned the murder of "Biggie" Chan. The evidence shows that neither of them participated in the actual killing of Chan.

During the cross-examination of Low by Jonah Iaea's counsel, the latter read from several pages of a transcript of Low's entire testimony in the Melandre trial, either to refresh the witness' recollection or to show that he had made prior inconsistent statements. On redirect examination, the prosecution offered the entire transcript consisting of 206 pages into evidence, and it was admitted over the objection of Pokini's counsel. The transcript contained the following, which had not been referred to by Iaea's counsel:

Q. How about the Wongie murder? Wilfred Wong. You were arrested for that, weren't you?

A. Yes, I was.

Q. You participated in that one, didn't you?

A. Yes, I did.

Q. You held the torch while he was being shot down?

A. Yes, I did.

Q. And you helped cover up the body in a hole?

A. Yes, I did.

Q. Was that before or after you started going around with Pokini to gun down "Biggie" Chan?

A. What was before?

Q. The Wilfred Wong murder?

A. Wilfred Wong murder was April 15, 1972.

Q. That was you and Pokini, right?

A. Myself, Pokini, Philip Sylva took him for a ride.

\* \* \* \*

(By Mr. Jung) Pokini kicked Wongie as he pumped five or six bullets into him? -

A. He shot Wongie and Wongie was leaning over and he kicked him over, pushed him with his feet.

Q. This kicking your victim, that's what Philip the Bandit Sylva does, too, doesn't he?

A. I don't know what you talking about.

Q. Isn't that what he did to —

A. Philip Sylva was hiding in the bushes.

Q. Now, for the Wongie murder, you and Pokini were planning to put the blame on Philip Sylva, isn't that right?

A. Yes. At Halawa Jail, we was planning that because we knew Philip Sylva was testifying against us.

Q. So your game was after you and Pokini made a killing, you would put the blame on somebody else?

A. Well, the way it was really going to be done is we going cop a plea to the crimes, cut Melandre loose so that he can take care business outside and try to drag the other witnesses to prison with us so we can kill 'em in prison. That was the plan.

* * * *

Q. You have seen Pokini kill before that, haven't you?

A. Yes, I did.

Q. Who else did you see him kill?

A. Doris McCoy.

Q. Who was present at that?

A. Pokini and myself.

Q. Who else did you see Pokini kill?

A. That was it.

Q. So the death of Doris McCoy was you and Pokini, right?

A. Yes.

* * * *

Q. Did you ever have an occasion to testify in the case

of State of Hawaii versus James Pokini, and others, known as the Liberty House case?

A. Yes, I did.

Q. What was the result of that case?

A. Two of them got found guilty and the rest pleaded guilty.

The transcript also contained other detailed references to these other crimes. They were completely irrelevant to the issues upon which the guilt of the defendant in this case was determined. They were improperly admitted and were so prejudicial as to deprive the defendant of his constitutional right to a fair trial. In *State v. Kahinu*, 53 Haw. 536, 549, 498 P.2d 635, 643 (1972), we said that "the deliberate injection by prosecution witnesses of irrelevant references to prior arrests, convictions, or imprisonment may generate insurmountable prejudice to the cause of an accused." The case before us falls squarely within the principles we laid down in *Kahinu*. Moreover, evidence of other crimes allegedly committed by the accused, which are collateral to the issues to be tried, are ordinarily inadmissible. *Boyd v. United States*, 142 U.S. 450 (1892); *State v. Carvelo*, 45 Haw. 16, 361 P.2d 45 (1961); *United States v. Dressler*, 112 F.2d 972 (7th Cir. 1940).

It appears from the record that defense counsel failed to direct the trial court's attention to these particular passages when interposing his objection to the transcript's admission into evidence. Nevertheless, the trial court should have insisted upon it, and should have been alert to the inherent danger of admitting into evidence, without even a cursory examination, the entire testimony of an admitted accomplice given at an earlier trial in which the defendant was not even a participant in those prior proceedings. Moreover, the transcript was originally used by Jonah Iaea's counsel for Iaea's presumed benefit and not for the benefit of the defendant. The trial court gave no limiting instruction to the jury regarding the use of the transcript, but even if it had, the highly prejudicial effects of the evidence could not have been dissipated thereby.

22

The State itself was not entirely blameless in the matter. The prosecutor was fully aware of the contents of the transcript. His deliberate injection of incompetent matter into the proceedings was prosecutorial misconduct of the most prejudicial nature. *State v. Kahinu, supra; White v. State*, 272 N.E.2d 312 (Ind. 1971).

II

The defendant, Pokini, took the witness stand to testify in his own defense. He denied his involvement in the conspiracy to murder Harold "Biggie" Chan, and the record shows that he did not participate in the actual killing. During the cross-examination of the defendant, the prosecution was permitted over objection to ask him repeated questions relative to his employment and sources of income. The defendant did not testify on those matters on direct examination. The prosecution's admitted purpose in pursuing this line of examination was to impeach the defendant's credibility. The defendant assigns this as additional ground for reversal.

A defendant who elects to testify in his own defense is subject to cross-examination as to any matter pertinent to, or having a logical connection with the specific offense for which he is being tried. *Johnson v. United States*, 318 U.S. 189 (1943); *Territory v. Bell*, 43 Haw. 23 (1958); *Territory v. Hart*, 24 Haw. 349 (1918). And once having taken the witness stand in his behalf, the defendant may be cross-examined on collateral matters bearing upon his credibility, the same as any other witness. The scope and extent of examination in these areas must necessarily be left to the sound discretion of the trial judge. The defendant may be asked questions regarding his occupation or employment. *Bolin v. Commonwealth*, 407 S.W.2d 431 (Ky. 1966); *see Territory v. Tamashiro*, 37 Haw. 552 (1947). But there are obvious limitations beyond which the court may not allow the examiner to venture. The subject matter of the inquiry must have some rational bearing upon the defendant's capacity for truth and veracity. *Asato v. Furtado*, 52 Haw. 284, 474 P.2d 288 (1970). And where the

testimony sought to be elicited is of minimal value on the issue of credibility and comes into direct conflict with the defendant's right to a fair trial, the right of cross-examination into those areas must yield to the overriding requirements of due process. *See State v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971), *Bolin v. Commonwealth*, *supra*.

While we find that the trial court was somewhat overly permissive in the cross-examination of the defendant relative to his employment, we are satisfied that this, in and of itself, did not prejudice his cause. Of more serious concern to this court, however, was the trial judge's conduct in ruling upon the objections interposed by the defendant's counsel to the questions asked the defendant on cross-examination. There was no necessity for the following exchange to have taken place in the presence of the jury:

> THE COURT: Very well. Mr. Pokini, the Court hereby orders you to answer the question.
> THE WITNESS: On advice of my counsel, I refuse to answer that question.
> THE COURT: Mr. Conklin, you are the counsel for the defendant. The Court has ruled on this matter. The Court at this time would like to know what is your advice to counsel [*sic*] in the face of the Court's ruling?
> MR. CONKLIN: I cannot discuss that in the presence of other people, your Honor.
> THE COURT: You have heard the defendant's answer.
> MR. CONKLIN: Yes, your Honor.
> THE COURT: Do you concur with the defendant's answer?
> MR. CONKLIN: Your Honor, —
> THE COURT: You are an officer of this court; and as an officer of this court, you have the obligation to uphold the law. The Court has pronounced the law in this case by ruling.
> MR. CONKLIN: Yes, your Honor.
> THE COURT: Would you like to confer with the defendant before you proceed further?

MR. CONKLIN: I don't understand what your Honor's question to me is.

THE COURT: You have heard the defendant's answer on the witness stand.

MR. CONKLIN: Yes.

THE COURT: He said, "On advice of counsel."

MR. CONKLIN: Yes.

THE COURT: Are you advising him not to answer this in the face of the Court's order to him to answer it?

MR. CONKLIN: Your Honor, I cannot disclose the advice I have given to my client.

THE COURT: Very well. Then the Court at this time would like to ask you: Do you advise the defendant not to answer this question in the face of the Court's order?

MR. CONKLIN: Your Honor, I cannot disclose, as being a confidential communication, the advice I have given my client, and your Honor knows that I cannot.

THE COURT: Very well. Then the matter will stand in the following posture: That the defendant has refused to answer the question, and the jury has heard that answer. That is the way it will stand. The Court normally might take —

MR. CONKLIN: Excuse me for interrupting you, your Honor. I'm sorry.

THE COURT: Mr. Conklin.

MR. CONKLIN: I have advised my client of the consequences of refusing to answer if ordered by the Court. I have done that. I have advised him of the consequences.

THE COURT: Very well. In a situation such as this, the Court may normally take action against the witness for failing to abide by the Court's order. In this case the Court will take no action; simply let the matter rest where it is, and the triers of facts have heard the answer.

Following the resumption of cross-examination on matters totally unrelated to the foregoing exchange, the trial judge, almost as an afterthought, interrupted and further commented:

THE COURT: By the way, the Court would like to state

for the record that the Court will look into disciplinary matters against counsel later on.

You may proceed.

The Court is reserving that matter at this time.

MR. WEIGHT: Very well. your Honor.

MR. CONKLIN: Your Honor. based on your Honor's comment, I have to move for a mistrial.

THE COURT: Denied.

It was improper for the trial judge to make these remarks in the presence of the jury, especially coming as it did on the heels of an extended exchange that could have had no other effect than to demean defense counsel in the eyes of the jury.[1] *State v. Pokini*, 55 Haw. 640, 526 P.2d 94 (1974). Moreover, there was no apparent legal basis for the trial court's prejudicial comment relative to disciplinary proceedings against defendant's counsel. In *Maness v. Meyers*, 95 S.Ct. 584, 596 (1975), the Court stated:

> We conclude that an advocate is not subject to the penalty of contempt for advising his client, in good faith, to assert the Fifth Amendment privilege against self-incrimination in any proceeding embracing the power to compel testimony. To hold otherwise would deny the constitutional privilege against self-incrimination the means of its own implementation. When a witness is so advised the advice becomes an integral part of the protection accorded the witness by the Fifth Amendment.

We do not doubt the personal integrity and inherent fairness and impartiality of the trial judge. But it is equally

---

[1] The following is but one other example of the court's propensity for injecting unnecessary remarks into the proceedings:

THE COURT: Mr. Conklin, is there anything that the Court should know regarding this refusal to answer. aside from what the court knows from the proceeding in court?

MR. CONKLIN: Your Honor. I'm embarrassed to say I did not hear the question.

THE COURT: You should be embarrassed because you people are not paying attention to the trial.

MR. CONKLIN: I am paying attention to the trial. your Honor. I was not paying attention to that question.

essential to a fair trial that the presiding judge endeavor at all times to maintain an attitude of fairness and impartiality. *State v. Pokini, supra.* There was absolutely no justification for the conduct of the trial judge in these and other instances reflected by the record.

In view of the erroneous admission of prejudicial matter into evidence, we reverse and remand for new trial.

*Donald K. Tsukiyama,* Public Defender, for defendant-appellant.

*Herbert T. Woolley,* Deputy Prosecuting Attorney *(Maurice Sapienza,* Prosecuting Attorney), for plaintiff-appellee.