108 P.3d 974

**STATE of Hawai'i, Respondent–
Plaintiff–Appellee,**

v.

**Sapatumoeese MALUIA, Petitioner–
Defendant–Appellant.**

No. 25689.

Supreme Court of Hawai'i.

March 24, 2005.

---

Joyce K. Matsumori–Hoshijo, Deputy Public Defender, for petitioner-defendant-appellant Sapatumoeese Maluia, on the writ.

LEVINSON, ACOBA, and DUFFY, JJ.; with ACOBA, J., concurring separately; and NAKAYAMA, J., concurring separately and dissenting, with whom MOON, C.J., joins.

Opinion of the Court by DUFFY, J.

Following a jury trial in the Circuit Court of the First Circuit, the Honorable Richard

Perkins presiding, petitioner-defendant-appellant Sapatumoeese Maluia was found guilty of murder in the second degree in violation of Hawai'i Revised Statutes (HRS) § 707–701.5 (1993).[1] On November 29, 2004, the Intermediate Court of Appeals (ICA) issued a summary disposition order (SDO) affirming the circuit court's February 12, 2003 judgment. *State v. Maluia,* No. 25689, 106 Hawai'i 80, 101 P.3d 689, 2004 WL 2700014 (Haw.App. November 29, 2004) [hereinafter, the ICA's SDO]. Maluia subsequently applied for a writ of certiorari to review the ICA's SDO.

We granted Maluia's application for a writ of certiorari for the sole purpose of addressing the following issue of first impression in this jurisdiction: whether the prosecution may ask a defendant to comment on the veracity of another witness. For the reasons discussed *infra,* we agree with Maluia that the prosecution may not ask a defendant to comment on another witness's veracity. Nevertheless, based on the record presented, we hold that this error was harmless beyond a reasonable doubt and therefore affirm the ICA's SDO.

## I. *BACKGROUND*

At approximately 8:30 p.m. on October 12, 2000, at Ke'ehi Lagoon Park, Maluia repeatedly hit Feao Tupuola, Jr. with a baseball bat. Tupuola was pronounced dead at 9:31 p.m. On October 18, 2000, an O'ahu grand jury indicted Maluia for second degree murder.

At trial, the prosecution presented Eugene Kepa, Jr. and Deidra Ahakuelo as witnesses. Kepa and Ahakuelo were at Ke'ehi Lagoon Park having dinner with their children on October 12, 2000. Kepa did not know either Maluia or Tupuola before this incident.[2] Kepa testified that Maluia was sitting in his car when Tupuola approached the car, carrying a knapsack and two plate lunches; Maluia was in the driver's seat, then got out of the car and got back in the car on the passenger side. Tupuola got in the driver's seat and put the car in reverse. He then put the car back in park and got out of the car quickly, after which he moved to the front of the car and tripped over the curb. According to Kepa, Maluia retrieved a baseball bat from the back seat of the car as he got out of the car. Maluia approached Tupuola, holding the bat in such a way that Tupuola could not have seen the bat. Maluia then hit Tupuola's hands with the bat several times, after which Maluia hit Tupuola in the head repeatedly and forcefully. Kepa did not see Tupuola try to hurt Maluia in any way, nor did Kepa see Tupuola with any weapons. Kepa testified that Maluia twice left Tupuola to wash his bat at a faucet on the other side of the parking lot, and that when Maluia returned to Tupuola he continued to hit him with the bat. When Maluia stopped, he hugged Tupuola, laid him down on the ground, and then got in his car and drove away. Ahakuelo (Kepa's girlfriend) also testified that Maluia hit Tupuola repeatedly with a baseball bat, that he rinsed off his bat at the faucet, and that he continued to hit Tupuola after returning from the faucet. Ahakuelo further testified that Maluia put his arms around Tupuola at the end of the incident.

Maluia testified that he and Tupuola used to socialize at Ke'ehi Lagoon Park, but that, leading up to the incident on October 12, 2000, Tupuola had become increasingly hostile towards him. Maluia speculated that Tupuola had become infatuated with Maluia's friend, Lisa Masseth, and that Tupuola became upset when he saw Maluia speaking with Masseth.

Maluia testified that, shortly after he arrived at the park on October 12, 2000, Tupuola assaulted him (specifically, that Tupuola "falsecracked" him). Another friend of Maluia's, Jessie Tupua, told Maluia that Tupuola

---

**1.** HRS § 707–701.5, entitled "Murder in the second degree," provides:

(1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

**2.** Ahakuelo did not specifically testify as to whether she knew Maluia or Tupuola before this incident.

was drunk and that he (Maluia) should not worry about the assault; Tupua (Maluia's friend) then escorted Maluia back to Maluia's car. Maluia testified that "as far as I was concerned that thing is pau [3] already." (Tupua testified that he saw a group of people separate Maluia from Tupuola, but that he did not see Tupuola assault Maluia; in fact, none of the defense's witnesses (other than Maluia) testified as to the alleged assault.)

Maluia then testified that, approximately twenty minutes later (while he was still in his car), Tupuola rushed up to Maluia's car and said, " 'Fuck you, old man. Now I'm gonna finish what I started out to do.' " Maluia stated that he was afraid and that he started to leave in his car, but that he decided to stay because his friends were there and because he had to return to the park the next day. As he started to get out of his car, Maluia stated, Tupuola "made a move with his hand, a real quick move under his shirt." Maluia thought that Tupuola was reaching for some kind of weapon, so Maluia went back to his car and pulled out a bat. Maluia stated that Tupuola then charged him, so he started swinging the bat at Tupuola's hands to knock whatever weapon he had out of his hands. Maluia believed that Tupuola was trying to get the bat away from him, and he was afraid that if Tupuola got the bat he would begin hitting Maluia with it. Maluia testified that he hit Tupuola, breaking his bat and knocking Tupuola down. Maluia then started to leave, at which point Tupuola got up and ran towards his knapsack. Maluia was concerned that Tupuola might have a weapon because, prior to this incident, Tupuola had shown Maluia a knife with a four- to six-inch blade and had discussed his knowledge of guns with Maluia. Maluia then got another bat out of his car. Maluia testified that Tupuola was still looking through his knapsack, and Maluia said, " 'What are you doing? What are you doing?' " Maluia then started hitting Tupuola again because he was afraid of what Tupuola would retrieve from his knapsack. Maluia testified that "I kept swinging. I kept swinging. And I just lost

it, you know. I just lost it. And I—I lost it." Maluia testified that he did not really remember what happened after that.

Maluia was arrested at 9:32 p.m. on October 12, 2000. Maluia's Blood Alcohol Content (BAC) was 0.131.[4] Tupuola's BAC (according to the forensic pathologist) was 0.195.

During the cross-examination of Maluia, the prosecution asked, "Do you know whether [Kepa and Ahakuelo] would have any reason to make up a story against you ... that you can think of?" Maluia's counsel objected to the question, and the circuit court overruled the objection. Maluia testified that he could not think of any reason. On redirect examination, the circuit court refused to allow Maluia's counsel to question him regarding this statement.

On September 30, 2002 (approximately three hours after the circuit court finished instructing the jury), the jury found Maluia guilty of second degree murder. The circuit court sentenced Maluia to an indeterminate maximum term of imprisonment for life with the possibility of parole. The circuit court also ordered Maluia to pay restitution in the amount of $433.41 in addition to a fee of $2,200.00 to the Crime Victim Compensation Fund.

Maluia appealed, and on March 17, 2004, the case was assigned to the ICA. On appeal to the ICA, Maluia argued that he was entitled to a new trial because of prosecutorial misconduct and because the circuit court improperly instructed the jury on extreme mental or emotional disturbance (EMED). On November 29, 2004, the ICA issued its SDO affirming the judgment of conviction and sentence.

Maluia filed an application for a writ of certiorari on December 29, 2004. In his Application, Maluia does not contest the ICA's conclusion with respect to the EMED instruction, but he does contest the ICA's conclusion with respect to his allegations of prosecutorial misconduct. Specifically, Mal-

---

3. "Pau" means, among other things, "finished" or "ended." M.K. Pukui & S.H. Elbert, *Hawaiian Dictionary* 319 (rev. ed.1986).

4. The Honolulu Police Department Officer who administered the test did not testify as to the time at which he administered the test.

uia alleges that the following four actions constituted prosecutorial misconduct: (1) during cross-examination of Maluia, the prosecution improperly required Maluia to assess the veracity of witnesses Kepa and Ahakuelo; (2) during closing argument, the prosecution improperly commented on Maluia's theories of his defense by arguing that Maluia's two defenses—self-defense and EMED—were inconsistent; (3) during closing argument and rebuttal, the prosecution argued that Maluia fabricated his testimony; and (4) during rebuttal, the prosecution improperly shifted the burden of proof to the defendant by implying that, had Tupuola actually assaulted Maluia, Maluia would have had a witness to testify to that fact. The ICA responded to these arguments by concluding: "In each instance [of alleged prosecutorial misconduct], either (1) the prosecutor did not express or imply what Maluia charges the prosecutor expressed or implied; or (2) the prosecutor did not commit prosecutorial misconduct; or (3) the utterances were harmless beyond a reasonable doubt; or (4) a combination thereof." (Citations omitted.)

We granted Maluia's Application on January 10, 2005, and we affirm the ICA's SDO. On the record presented, we agree with the ICA's conclusions with respect to Maluia's claims of prosecutorial misconduct in closing and rebuttal arguments. The ICA did not, however, specifically address the issue of whether the prosecution acted improperly in asking Maluia to comment on the veracity of prosecution witnesses Kepa and Ahakuelo. As this is an issue of first impression for this court, we will now address it.

## II. STANDARD OF REVIEW

■ Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction. Factors considered are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.

*State v. Sawyer*, 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998) (citations and internal quotation signals omitted).

## III. DISCUSSION

### A. The Prosecution's Question Constituted Prosecutorial Misconduct.

#### 1. The prosecution's question was improper.

■ We hold that the prosecution may not ask a defendant to comment on another witness's veracity. Such questions, referred to as "were-they-lying" questions, are improper for the following reasons: (1) they invade the province of the jury, as determinations of credibility are for the jury; (2) they are argumentative and have no probative value; (3) they create a risk that the jury may conclude that, in order to acquit the defendant, it must find that a contradictory witness has lied; (4) they are inherently unfair, as it is possible that neither the defendant nor the contradictory witness has deliberately misrepresented the truth; and (5) they create a "no-win" situation for the defendant: if the defendant states that a contradictory witness is not lying, the inference is that the defendant is lying, whereas if the defendant states that the witness is lying, the defendant risks alienating the jury (particularly if the contradictory witness is a law enforcement officer). *See, e.g., United States v. Boyd*, 54 F.3d 868, 871 (D.C.Cir.1995) ("Determinations of credibility are for the jury, not for witnesses. It is therefore error for a prosecutor to induce a witness to testify that another witness, and in particular a government agent, has lied on the stand." (Citations and internal quotation signals omitted.)); *State v. Singh*, 259 Conn. 693, 793 A.2d 226, 236–37 (2002) (holding that "were-they-lying" questions are improper because they invade the province of the jury, have no probative value, are argumentative, and "create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied"); *State v. Graves*, 668 N.W.2d 860, 872–73 (Iowa 2003) (holding that "were-they-lying" questions are improper because they put the defendant in a no-win situation and because "[i]t is unjust to

make the defendant give an opinion as to who is lying when, in fact, it is possible that neither witness has deliberately misrepresented the truth"); *State v. Emmett*, 839 P.2d 781, 787 (Utah 1992) ("The question … is argumentative and seeks information beyond the witness's competence.... [I]t suggests to the jury that a witness is committing perjury even though there are other explanations for the inconsistency. In addition, it puts the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury." (Footnote omitted.)).

■ In the instant case, the prosecution did not directly ask Maluia whether Kepa and Ahakuelo were lying; instead, the prosecution asked: "Do you know whether [Kepa and Ahakuelo] would have any reason to make up a story against you … that you can think of?" While the question directly asked whether Maluia knew of any motivation for the prosecution's witnesses to lie, the practical effect was that Maluia was asked to comment on the veracity of the prosecution's witnesses. Therefore, the prosecution's question was improper and the circuit court erred in requiring Maluia to answer the question.[5]

## 2. The improper question constitutes prosecutorial misconduct.

■ The term "prosecutorial misconduct" is a legal term of art that refers to *any* improper action committed by a prosecutor, however harmless or unintentional. Therefore, our conclusion that the prosecution's question was improper compels us to apply the label "prosecutorial misconduct."

Recently, the ICA suggested that we create a separate label for prosecutorial conduct that, while improper, was relatively minor. As the ICA stated, "there is a difference between advocacy involving a prosecutorial mistake/error and advocacy involving prose-

cutorial misconduct." *State v. McElroy*, 105 Hawai'i 379, 386 n. 7, 98 P.3d 250, 257 n. 7 (App.2004) [hereinafter *McElroy (ICA)* ], *reversed*, 105 Hawai'i 352, 97 P.3d 1004 (2004). Judge Nakamura, while dissenting from the majority's opinion, agreed with this point and explained:

I agree with the majority's distinction between prosecutorial misconduct and prosecutorial error. Trial lawyers are required to make countless judgment calls under the stress and pressure of trial. A judgment call that we later determine on appeal to have been made in error should not be labeled "misconduct" simply because it was made by a prosecutor. Instead, as [the majority] properly recognizes, the label of "prosecutorial misconduct," with its attendant disciplinary repercussions, should be limited to dishonest and deceitful acts made in bad faith.

*McElroy (ICA)* at 392, 98 P.3d at 263 (Nakamura, J., dissenting) (footnote omitted). In reviewing the ICA's opinion, we impliedly accepted the ICA's suggestion that there is, in fact, a distinction between "prosecutorial error" and "prosecutorial misconduct" when we stated that "[a] mistake or error by the prosecution is reviewed under the harmless beyond a reasonable doubt standard applied to prosecutorial misconduct." *McElroy*, 105 Hawai'i at 356, 97 P.3d at 1008.

■ We agree that there are varying degrees of prosecutorial misconduct. We also recognize that most cases presenting allegations of "prosecutorial misconduct" to this court do not involve prosecutors who intend to eviscerate the defendant's constitutional and statutory rights; instead, they involve situations, like the instant case, in which the law is not entirely clear and where the prosecutor makes a judgment call as to whether a particular question or argument is proper. We share Judge Nakamura's concerns re-

---

5. Our holding does not impair the prosecution's right to ask a defendant foundational questions regarding the nature, extent, or absence of a relationship between the defendant and a witness. Indeed, all of the foundational questions presented in the dissent are legitimate; it is only the conclusory "were-they-lying" question that is improper. Furthermore, our holding does not thwart counsel's right to draw reasonable inferences when arguing to the jury. We hold only that an attorney may not ask the defendant to offer opinions as to whether and why another witness is lying.

garding the possibility of disciplinary sanctions for this type of conduct: where the propriety of a prosecutor's argument or question is unclear, such that reasonable appellate judges may reach different conclusions as to whether that conduct is proper, a prosecutor should not face disciplinary action for that conduct.

Nevertheless, we decline to create a separate category of prosecutorial "mistake" or "error." There are three reasons why we believe that our current method of analysis—in which all improper conduct is labeled "prosecutorial misconduct"—is more appropriate.

■ First, there is no need to create separate categories because this court already distinguishes innocuous prosecutorial misconduct from more serious deceitful behavior: where the improper conduct is so egregious that the defendant was denied her or his right to a fair trial, we reverse the defendant's conviction and prohibit reprosecution based on the double jeopardy clause (article I, section 10 of the Hawai'i Constitution), *see State v. Rogan*, 91 Hawai'i 405, 424, 984 P.2d 1231, 1250 (1999) (barring reprosecution where the prosecutor's appeal to racial prejudice "was so egregious, from an objective standpoint, that the inference is inescapable that the remark clearly denied [the defendant] his right to a fair trial"); where the improper conduct is less serious, we either affirm the conviction (if the misconduct was harmless beyond a reasonable doubt, *see State v. Valdivia*, 95 Hawai'i 465, 483–84, 24 P.3d 661, 679–80 (2001) (holding that the prosecutorial misconduct was harmless beyond a reasonable doubt)) or vacate the conviction and remand for a new trial (if the misconduct was not harmless beyond a reasonable doubt, *see State v. Wakisaka*, 102 Hawai'i 504, 516, 78 P.3d 317, 329 (2003) ("[W]hile the prosecutorial misconduct reached the level of reversible error, the misconduct was not so egregious that double jeopardy should attach to prevent retrial.")). In sum, whenever a defendant alleges prosecutorial misconduct, this court must decide: (1) whether the conduct was improper; (2) if the conduct was improper, whether the misconduct was harmless beyond a reasonable doubt; and (3) if the misconduct was not harmless, whether the misconduct was so egregious as to bar reprosecution. In the course of making these three determinations, the seriousness of the misconduct becomes evident, and we need not attach a separate label for our disposition to be clear. Consequently, a separate label for "misconduct" cases and "error" cases is unnecessary.

■ Second, a finding of "prosecutorial misconduct" is not equivalent to a finding of "professional misconduct" pursuant to the Hawai'i Rules of Professional Conduct (HRPC), and a prosecutor need not face disciplinary sanctions merely because we have used the term "prosecutorial misconduct." The Rules of the Supreme Court of the State of Hawai'i (RSCH) do not provide the Disciplinary Board of the Hawai'i Supreme Court (the Disciplinary Board) with authority to investigate a prosecutor merely because this court has applied that label; on the contrary, the Disciplinary Board may only investigate an attorney where the attorney has allegedly violated the HRPC. RSCH 2.2 (2004). Given that the seriousness of the prosecutorial misconduct is evident in our dispositions, we believe that the Disciplinary Board is capable of distinguishing between those cases where the prosecutor should face disciplinary action and those cases where the prosecution has made a good faith mistake (including those cases, like the instant case, where the impropriety of the conduct has not previously been clearly established).

■ Third, we believe that separate nomenclature for different types of prosecutorial misconduct would lead to protracted litigation over semantics; this would place an additional burden on our courts with no corresponding benefit. Our primary goal when analyzing a defendant's appeal is to balance the defendant's right to a fair trial against the public's need for effective enforcement of our criminal laws, *see Rogan*, 91 Hawai'i at 417, 984 P.2d at 1243, and separate labels will not assist us in making these substantive decisions.

We are aware, as the dissent makes clear, that a finding of "prosecutorial misconduct" may be misunderstood by some to automati-

cally connote "a rebuke of [the prosecutor's] professionalism, trustworthiness, or competence." Dissent at 33, 108 P.3d at 987. We again emphasize, however, that "prosecutorial misconduct" is a legal term of art, and, absent any further action by the Disciplinary Board or this court, should not be reflexively construed as a "stain to [the prosecutor's] reputation." Dissent at 33, 108 P.3d at 987. Instead, each case of "prosecutorial misconduct" must be evaluated on its own specific facts. With this in mind, we will continue to apply the term "prosecutorial misconduct" to all prosecutorial improprieties, regardless of whether the error at issue was a trivial oversight or a flagrant abuse of prosecutorial power.

## B. *The Prosecutorial Misconduct Was Harmless Beyond A Reasonable Doubt.*

We have repeatedly held that we will not overturn a defendant's conviction if the prosecution's misconduct was harmless beyond a reasonable doubt. "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." *State v. Agrabante,* 73 Haw. 179, 198, 830 P.2d 492, 502 (1992); *see also State v. Bunch,* 180 N.J. 534, 853 A.2d 238, 246 (2004) (holding that the prosecution should not have asked the defendant to comment on other witnesses' credibility but that the misconduct did not warrant a new trial in light of the substantial evidence against the defendant).

After considering these three factors, we conclude that the prosecutorial misconduct in the instant case was harmless beyond a reasonable doubt. Although the prosecution's question was improper, the conduct was less egregious than that presented in those cases where we vacated the defendants' convictions and remanded for new trials. *See, e.g., State v. Wakisaka,* 102 Hawai'i 504, 78 P.3d 317 (2003) (vacating and

remanding where the prosecution improperly commented on the defendant's failure to testify); *State v. Pacheco,* 96 Hawai'i 83, 95, 26 P.3d 572, 584 (2001) (vacating and remanding where "the [prosecution's] characterization of [the defendant] as an 'asshole' strongly conveyed his personal opinion and could only have been calculated to inflame the passions of the jurors and to divert them, by injecting an issue wholly unrelated to [the defendant's] guilt or innocence into their deliberations, from their duty to decide the case on the evidence"); *State v. Marsh,* 68 Haw. 659, 728 P.2d 1301 (1986) (vacating and remanding where the prosecutor, in closing, repeatedly stated her personal belief that the defendant was guilty). Consequently, the first factor (the nature of the misconduct) weighs against Maluia. The second factor (the promptness or lack of a curative instruction), on the other hand, weighs in favor of Maluia: the circuit court not only failed to issue a curative instruction, but also prevented Maluia's counsel from questioning Maluia about his answer on redirect examination. The third and final factor (the strength or weakness of the evidence against the defendant), however, convinces us that the prosecutorial misconduct in the instant case was harmless beyond a reasonable doubt. The evidence against the defendant included two eyewitness accounts from witnesses unconnected to the defendant or the victim. The evidence also showed that the defendant's BAC was 0.131, raising additional doubts as to the defendant's credibility. Therefore, the prosecutorial misconduct was harmless beyond a reasonable doubt.

## IV. *CONCLUSION*

Based on the foregoing, we affirm the ICA's November 29, 2004 Summary Disposition Order affirming the February 12, 2003 judgment of the circuit court.

Concurring Opinion by ACOBA, J.

While I join in the majority,[1] I write separately because, with all due respect, the

---

1. The majority holds that "the prosecution may not ask a defendant to comment on another witness's veracity." Majority opinion at 33, 108 P.3d at 987. This holding is consistent with the following *ABA Standards for Criminal Justice:*

*Prosecution Function and Defense Function* (3d ed.1993) that, on their faces, state:

A *prosecutor should not knowingly* and for the purpose of bringing inadmissible matter to the attention of the judge or jury offer inadmis-

dissent's qualification of the "prosecutorial misconduct" test would distort the function assigned prosecutors under our system. As stated in the majority opinion, the fact is that "prosecutorial misconduct" is a broad term long employed in our cases. While the cases may, but do not always involve "bad faith or [an] inflammatory act" or necessarily an express violation of the Hawaiʻi Rules of Professional Conduct, they encompass these and other instances of error. As justification for a change in the use of the term, the dissent raises the specter of disciplinary measures. However, the record is devoid of any basis upon which to rest this speculation and there is no indication that disciplinary sanctions have been the common consequence of prosecutorial error. *See State v. Dowsett,* 10 Haw.App. 491, 496, 878 P.2d 739, 742 (1994) ("Defendant complains that in 'case after case reversed by the appellate courts ... no action is ever taken against the offending prosecutors.' He relates that the effect of reversal is that the State 'gets to retry the accused.'" (Brackets omitted.)).[2]

But more importantly, that the prosecution must be held to a standard higher than "good faith" is a proposition long established and fundamental to the prosecution's role in the criminal law system. The prosecutor's obligation is to do justice and not simply to convict. *See State v. Wong,* 97 Hawaiʻi 512, 527, 40 P.3d 914, 929 (2002) (recognizing "the State's strong interest in prosecuting crime, but ... [being] equally cognizant that the State's duty is to pursue justice, not convictions, and the prosecutor has a duty to act as a minister of justice to pursue prosecutions by fair means"); *ABA Standards* 3–1.2(c) ("The duty of the prosecutor is to seek justice, not merely to convict.") When sight of this duty is lost, the level of prosecutorial advocacy is depressed. And, the dispensation of justice in our state suffers. We should not fail to remember that the high regard in which the prosecutor is held rests on his or her position as the representative of the people. Because of that position, wide discretion has been vested in the prosecutor in the prosecution of cases and vast public resources have been allocated to the tasks assigned that office. Consequently, as the United States Supreme Court has said, the prosecutor is not to be viewed or treated as merely an advocate:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and *whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.* As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. *But, while he may strike*

---

sible evidence, *ask legally objectionable questions*, or make other impermissible comments or arguments in the presence of the judge or jury.

. . . .

A *prosecutor should not ask a question which implies the existence of a factual predicate for which a good faith belief is lacking.*

. . . .

The *prosecutor should not intentionally refer to* or argue on the basis of *facts outside the record whether at trial or on appeal,* unless such facts are matters of common public knowledge based on ordinary human experience or matters *of which the court may take judicial no-* tice.
*ABA Standards* 3–5.6(b); 3–5.7(d); 3–5.9 (emphases added).

The *ABA Standards* are instructive in this case. While they "are not intended to be used as criteria for the judicial evaluation of alleged misconduct of the prosecutor to determine the validity of a conviction[, t]hey may or may not be relevant in such judicial evaluation, depending upon all of the circumstances." *ABA Standards* 3–1.1.

**2.** In this regard, the *ABA Standards* state that "[t]he prosecution function should be performed by a public prosecutor who is a lawyer subject to the standards of professional conduct and discipline," *ABA Standards* 3–2.1, and "[i]t is the *duty of the prosecutor to know and be guided by* the standards of professional conduct as defined by applicable professional traditions, ethical codes, and [the] *law in the prosecutor's jurisdiction."* *ABA Standards* 3–1.2(e) (emphasis added). In light of these standards, exigencies of trial and purported "judgment calls" made "under the stress and pressure of trial," *State v. McElroy,* 105 Hawaiʻi 379, 392, 98 P.3d 250, 263 (App. 2004) (Nakamura, J., dissenting), cannot be a legal refuge from professional duties and obligations.

*hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.*

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314, (1935) (emphases added). In this context, the United States Supreme Court has reiterated that justice is the objective to be achieved in our courts and such justice must be accomplished "irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Hence,

> [s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."

*Id.*

As the Solicitor General of the United States has said,

> [t]he Solicitor General is not a neutral, he is an advocate; but an advocate for a client whose business is not merely to prevail in the instant case. My client's chief business is not to achieve victory but to establish justice. We are constantly reminded of the now classic words penned by one of my illustrious predecessors, Frederick William Lehmann, that the Government wins its point when justice is done in its courts.

*Id.* at 87 n. 2, 83 S.Ct. 1194. Again, this court has reiterated that view: "The prosecution has a duty 'to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused.'" *State v. Moriwaki,* 71 Haw. 347, 354, 791 P.2d 392, 396 (1990) (quoting *State v. Quelnan,* 70 Haw. 194, 198, 767 P.2d 243, 246 (1989)). Rather than enhance the standard of competence and professionalism expected of prosecutors, an approach which reduces or qualifies in some way the standard of conduct to that of intentional wrongdoing or bad faith diminishes the office of the prosecutor and signals a dangerous departure from the obligations society demands of its prosecutors.

Concurring and Dissenting Opinion by NAKAYAMA, J., in which MOON, C.J., joins.

We are once again called upon to determine whether a prosecutor's pointed cross-examination of a defendant oversteps the bounds of permissible advocacy in a criminal proceeding. At issue is the following exchange between the prosecution and defendant-appellant Sapatumoeese Maluia (Maluia):

> [DEPUTY PROSECUTING ATTORNEY (DPA):] Now let me ask you this, Mr. [Maluia]. Had you ever seen Mr. Eugene Kepa [(Kepa)] before he came into court the other day?
>
> [MALUIA:] Never have.
>
> [DPA:] Okay. You never saw him there on Thursday nights by the tennis courts with his family?
>
> [MALUIA:] Never have.
>
> [DPA:] And had you ever seen his wife before she came into court yesterday morning?
>
> [MALUIA:] Yesterday I saw her.
>
> [DPA:] Okay. But is that the first time you've ever seen her?
>
> [MALUIA:] Yes.
>
> [DPA:] Okay. So you don't know Eugene Kepa; right?
>
> [MALUIA:] Don't know him.
>
> [DPA:] And you don't know his girlfriend Deidra Ahakuelo [(Ahakuelo)]; is that correct?
>
> [MALUIA:] That's correct.
>
> [DPA:] All right. And as far as you know—well, let me ask you this. Do you know whether they would have any reason to make up a story against you—
>
> [DEPUTY PUBLIC DEFENDER (DPD):] Judge—
>
> [DPA:]—that you can think of?
>
> [DPD:] Objection. Form of the question. Speculation. Argumentative.
>
> [DPA:] I'm asking if he knows.
>
> [DPD:] He doesn't know them, Judge.

THE COURT: Well, I'll allow it.

[DPA:] Can you think of any reason, Mr. Maluia?

[MALUIA:] I can't think of any reason.

The majority contends that the prosecutor in the instant case committed misconduct by asking Maluia whether prosecution witnesses Kepa and Akahuelo "would have any reason to make up a story against you ... that you can think of?" I cannot concur that the question was improper, much less that the prosecutor committed misconduct by cross-examining Maluia as he did. Accordingly, I must dissent.

## I. THE PROSECUTOR COMMITTED NO ERROR

### A. Characterizing the Question

The majority contends that the prosecutor's question was "improper" because it was analogous to the "were-they-lying" questions held impermissible in other jurisdictions.

A "were-they-lying" question generally unfolds as follows:

Typically, the prosecutor will first ask the defendant if he heard the testimony of one or more of the state's witnesses. Then the prosecutor will ask the defendant if the witnesses' testimony was accurate. If the defendant states that the witnesses' testimony was not accurate, the prosecutor will ask the defendant to comment on the veracity of the witnesses' testimony by asking the defendant, "Were they lying?"

*State v. Pilot*, 595 N.W.2d 511, 516 n. 1 (Minn.1999).

I disagree with the majority's central hypothesis that the question put to Maluia is comparable to one which asks a defendant whether the prosecution's witnesses have lied. A plain reading of the inquiry here confirms that the prosecutor's question was confined to plumbing Maluia's personal knowledge for facts or circumstances bearing on the credibility of the prosecution's percipient witnesses to the crime. In no event was Maluia cornered into accusing those who previously took the stand of perjuring themselves before the jury.

In contending otherwise, the majority is blind to the distinction between the "were-they-lying" questions typified in *Pilot*, and questions phrased to elicit extrinsic evidence of another witness's bias. Those of the latter type are distinguishable because they strive to illuminate facts—as opposed to mere opinion—from which the jury may independently adduce whether a witness's testimony is free of fabrication. *See United States v. Akitoye*, 923 F.2d 221, 223–225 (1st Cir.1991) (whether defendant "kn[ew] of any reason why Mr. Aina would lie about you?" "inquired into the existence of any known basis for bias on the part of a key witness," and was therefore not a "were-they-lying" question); *United States v. Cole*, 41 F.3d 303, 309 (7th Cir.1994) (holding as "valid [those] questions that ask the testifying witness if he or she knows of biases or motives of another witness"). The majority's effort to exclude the prosecutor's question [1] simply ignores the commonsense meaning of the words actually employed.[2]

---

1. As the issue is not presented in this appeal, I express no opinion concerning the propriety of a *bona fide* "were-they-lying" question.

   I do note, however, that the majority neglects to mention the profound split of authority concerning whether this method of cross-examination is appropriate. While many courts adhere to the majority's position that "were-they-lying" questions are *per se* impermissible, a number of other jurisdictions either unconditionally permit such questions, *see Fisher v. State*, 128 Md.App. 79, 736 A.2d 1125, 1161–1164 (Ct. Spec.App.1999); *Whatley v. State*, 270 Ga. 296, 509 S.E.2d 45, 51–52 (1998), or allow them on a case-by-case basis, *see, e.g., State v. Johnson*, 273 Wis.2d 626, 681 N.W.2d 901, 909–910 (2004); *State v. Morales*, 198 Ariz. 372, 10 P.3d 630, 633 (Ct.App.2000); *State v. Hart*, 303 Mont. 71, 15 P.3d 917, 923–924 (2000); *State v. Pilot*, 595

N.W.2d 511, 518 (Minn.1999); *People v. Overlee*, 236 A.D.2d 133, 666 N.Y.S.2d 572, 575–577 (N.Y.App.Div.1997).

2. The majority's emphasis on the "practical effect" of the prosecutor's question is a dubious departure from our prior practice. Tellingly, we recently declined to speculate on the "practical effect" of cross-examination questions in *State v. Hauge*, where the following exchange was presented for our review:

   [DPA:] When you earlier testified that you don't think or you don't believe it was your blood in that hotel room and in the Ordway suitcases, that does not comport with what the D.N.A. expert testified earlier today. You heard her testify, isn't that true?

   [DEFENDANT:] Yes.

## B. Matters of Evidence

The question remains whether the prosecutor's inquiry and Maluia's response—when correctly characterized as solicitous of evidence relating to Kepa's and Ahakuelo's possible bias—were proper and admissible. I conclude that they were.

### 1. *Maluia's testimony was admissible.*

Rules 401, 402 and 403 of the Hawai'i Rules of Evidence (HRE) govern the admissibility of Maluia's testimonial evidence. Our starting point is the foundational concept of "relevance" defined in HRE Rule 401:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Guided by that definition, HRE Rule 402 demarcates general guidelines for the admissibility of relevant evidence:

All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawai'i, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

Finally, HRE Rule 403 accords the trial courts broad discretion to exclude relevant evidence after balancing competing considerations of probity, economy, and fairness:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence.

For the reasons that follow, I believe that Maluia's testimonial evidence was properly placed before the jury under the aforementioned principles of relevance and admissibility.

### a. *Maluia's testimony was relevant under HRE Rule 401.*

Maluia's testimony that he knew of no reason why Kepa and Ahakuelo would "make up a story against [him]" satisfied the relevancy requirement of HRE Rule 401. We uniformly recognize that "[t]he credibility of a prosecuting witness in a criminal case is always relevant," *State v. Okumura*, 78 Hawai'i 383, 399, 894 P.2d 80, 96 (1995) (quoting *State v. Liuafi*, 1 Haw.App. 625, 630, 623 P.2d 1271, 1275 (1981)), insofar as evidence of bias, interest, or motive has at least some tendency to aid the jury in "assessing the probative value of the [witness's] testimony." 1 *McCormick on Evidence* § 29, at 109 (John W. Strong ed., 5th ed.1999). Such was the case here, as Maluia's testimony was reflective of Kepa's and Ahakuelo's credibility, and made their eyewitness accounts of the crime more probable of belief.

### b. *Maluia's testimony was admissible under HRE Rule 402.*

Because Maluia's testimony was relevant, the circuit court was correct in adjudging the evidence admissible under HRE Rule 402. In this regard, I perceive no constitutional, statutory, or rule-based mandate that would require the statement's exclusion.

---

[DPA:] She testified that your D.N.A. was a perfect match. Your blood D.N.A. was a perfect match to the evidence recovered from inside the Ordway suitcases and inside Room 714, right? You heard that?
[DEFENDANT:] Yes.
103 Hawai'i 38, 54, 103 Hawai'i 38, 79 P.3d 131, 147 (2003).
On appeal, the defendant in *Hauge* cited *United States v. Boyd*, 54 F.3d 868 (D.C.Cir.1995)—an opinion relied on by the majority in this case—to support his claim that the prosecutor's questioning "impermissibly infringed on the jury's right to evaluate the credibility of the [prosecution's] DNA expert." 103 Hawai'i at 54, 79 P.3d at 147.

In essence, the defendant argued, as Maluia does here, that the "practical effect" of confronting him with contradictory testimony required him to comment on the expert witness's veracity. Rather than adopt the defendant's position, we instead took the colloquy at face value. We therefore rejected the defendant's argument as "missing the mark," inasmuch as "the DPA did not seek Hauge's evaluation of the DNA expert's credibility ..., but merely invited him to confirm that he had 'heard' the testimony." *Id.* at 57, 79 P.3d at 150. Thus, in contrast with today's majority, we refrained in *Hauge* from examining the challenged questions beyond the literal meaning of the words used.

### c. *The circuit court did not abuse its discretion in admitting Maluia's testimony under HRE Rule 403.*

Finally, the circuit court's decision to admit Maluia's testimony passes muster under HRE Rule 403. Acknowledging that " 'the delicate balance between probative value and prejudicial effect,' . . . 'lies largely within the discretion of the trial court,' " *Kaeo v. Davis*, 68 Haw. 447, 454, 719 P.2d 387, 392 (1986) (quoting *State v. Iaukea*, 56 Haw. 343, 349, 537 P.2d 724, 729 (1975)), I perceive no abuse in striking the balance to favor admissibility here. Given the circumstances, the nominal prejudice inuring from Maluia's testimony did not "substantially outweigh" its probative value in assisting the jury's weighing of Kepa's and Ahakuelo's rendition of events.

### 2. *Maluia's cross-examination was permissible in scope.*

As Maluia's testimony arose on cross-examination, the scope of the prosecutor's questions must have complied with HRE Rule 611(b). The Rule provides:

> Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

Because cross-examination is essential to satisfying the basic truth-seeking function of a trial, we accord the trial courts broad discretion in administering HRE Rule 611(b). *State v. Balisbisana*, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) ("The scope of cross-examination is generally within the sound discretion of the trial court."); *see also State v. Pokini*, 57 Haw. 17, 22, 548 P.2d 1397, 1400 (1976) (same).

That discretion is not abused when a trial court subjects a defendant who testifies in his own defense "to cross-examination as to any matter pertinent to, or having a logical connection with the specific offense for which he is being tried." *State v. Culkin*, 97 Hawai'i 206, 220–221, 35 P.3d 233, 247–248 (2001) (quoting *Pokini*, 57 Haw. at 22, 548 P.2d at 1400).

Nor does a court exceed its authority by granting counsel leeway in framing their questions on cross. *See* HRE R. 611(b) ("The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."). The latitude accorded those questions stems from the nature of cross-examination. Specifically,

> [c]ounsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. *Knapp v. Wing*, 72 Vt. 334, 340, 47 A. 1075; *Martin v. Elden*, 32 Ohio St. 282, 289. It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what fact a reasonable cross-examination might develop.

*Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624 (1931).

In this case, the prosecutor sought to develop information on Kepa's and Ahakuelo's credibility—a matter made relevant by their testimony at Maluia's trial. Because the issue was "pertinent to" and had "a logical connection with" the offense for which Maluia was charged, *see Culkin*, 97 Hawai'i at 220–221, 35 P.3d at 247–248, the circuit court did not abuse its discretion in permitting Maluia to be examined on that topic.

## II. THE ERROR, IF ANY, WAS NOT MISCONDUCT

I also disagree with the majority's conclusion that the prosecutor committed "misconduct" when questioning Maluia.

In *State v. McElroy*, 105 Hawai'i 352, 97 P.3d 1004 (2004), we recognized "prosecutorial mistake or error" as a form of improper advocacy that was distinguishable from "prosecutorial misconduct." Particularly, we stated:

> A mistake or error by the prosecution is reviewed under the harmless beyond a reasonable doubt standard applied to prosecutorial misconduct. Thus, an appellate court examines the record to determine whether there is a reasonable possibility

that the error complained of may have contributed to the defendant's conviction. *Id.* at 356, 97 P.3d at 1008.

The majority's abandonment of the distinction set out in *McElroy* is ill advised. Implicit in *McElroy* was our acknowledgment that prosecutorial "misconduct" was qualitatively different from prosecutorial "mistake." The basis for that difference lies in the opprobrium associated with the former term, the pejorative connotations of which are enforced by the word's use in judicial decisions,[3] professional codes of conduct,[4] and everyday speech [5] to describe unethical behavior or egregious prosecutorial overreaching.

I readily endorse the use of this court's supervisory power [6] to protect our adversary system from prosecutorial conduct that impedes the efficacy of the truth-seeking process. In exercising our authority, however, we must be mindful that words pregnant with meaning carry repercussions beyond the pale of the case at hand. The public face of the prosecutor—and her service to a broad community of interests—ensures that her actions will be scrutinized by those who are bound to misinterpret her "misconduct" in court as an automatic rebuke of her professionalism, trustworthiness, or competence. The stain to her reputation will come regardless of whether the taint was deserved.

In sum, I emphasize that *McElroy* in no way hinders the majority's effort to prohibit prosecutors from asking questions of the sort at issue here.[7] If error is therefore to be assigned in this case, it should be called what it clearly was: a mere "mistake."

## III. CONCLUSION

I reiterate that the questions posed by the prosecutor on Maluia's cross-examination were neither improper nor amounted to misconduct. I would affirm Maluia's conviction on the grounds that Maluia's testimony was admissible evidence pertaining to the credibility of the prosecution's witnesses.

---

3. *See, e.g., State v. Rogan*, 91 Hawai'i 405, 411, 415, 984 P.2d 1231, 1237, 1241 (1999) (prosecutor's statement that "finding 'some black, military guy on top of your daughter' is 'every mother's nightmare'" was a "particularly egregious form of prosecutorial misconduct" that appealed to racial prejudice).

4. The Hawai'i Rules of Professional Conduct (HRPC), for example, instructs that it is "professional misconduct" for a lawyer to:
   (a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;
   (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;
   (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;
   (d) fail to cooperate during the course of an ethics investigation or disciplinary proceedings;
   (e) state or imply an ability to influence improperly a government agency or official; or
   (f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.
   HRPC Rule 8.4 (2004).

5. "Misconduct" is often used in common parlance to connote "intentional wrongdoing" or a "deliberate violation of a rule of law or standard of behavior." *Webster's Third New International Dictionary of the English Language Unabridged* 1443 (Philip Babcock Gove ed., 1967).

6. *See* HRS § 602-4 (1993) ("The supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law.").

7. The majority believes that *McElroy's* distinction between "misconduct" and "mistake" has no "benefit," and will instead invite "protracted litigation over semantics." As argued above, the "benefit" of differentiating the terms lies in protecting the prosecutor's reputation from undeserved blemish. Nor will litigation be any more "protracted," since both "misconduct" and "mistake" involve improper prosecutorial conduct that is subject to harmless error analysis on appeal.