**Electronically Filed
Supreme Court
SCWC-30278
22-MAR-2012
08:13 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI, Respondent/Plaintiff-Appellee,

vs.

PETER KALANI BAILEY, Petitioner/Defendant-Appellant.

NO. SCWC-30278

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 30278; CR. NO. 07-1-0386)

MARCH 22, 2012

RECKTENWALD, C.J., NAKAYAMA, ACOBA, AND DUFFY, JJ.; AND
CIRCUIT JUDGE POLLACK, ASSIGNED IN PLACE OF MCKENNA, J., RECUSED

AMENDED OPINION OF THE COURT BY RECKTENWALD, C.J.

Peter Kalani Bailey was convicted in the Circuit Court of the Third Circuit on four counts of attempted sexual assault in the first degree in violation of Hawaiʻi Revised Statutes (HRS) §§ 705-500 and 707-730(1)(b), cited infra, in relation to an incident on July 22, 2007 in which Bailey allegedly attempted to engage in four acts of sexual penetration with MM, who was

twelve years old at the time.[1]  The ICA affirmed Bailey's

convictions.  State v. Bailey, No. 30278, 2011 WL 2520275 (Haw.

App. Apr. 25, 2011).

Several events occurred during trial, which are the

subject of Bailey's application for a writ of certiorari.  First,

it appears that the courtroom doors were locked for part of the

jury selection, and Bailey argues that this closure of the

courtroom violated his constitutional right to a public trial.

Second, during the jury's deliberations, Juror Nine informed the

other jurors that Bailey had previously been charged with and/or

convicted of murder.  Bailey argues that Juror Nine's statements

constituted juror misconduct, and that the circuit court abused

its discretion in denying his motion for mistrial in relation to

these statements.  Third, Bailey challenges the circuit court's

decision to replace Juror Nine with an alternate juror after

deliberations had begun, in violation of Hawai'i Rules of Penal

Procedure Rule 24(c).[2]  Bailey argues that this error was not

harmless beyond a reasonable doubt.  Finally, Bailey argues that

there was no rational basis in the evidence for instructing the

jury on the included offense of attempted sexual assault in the

first degree, of which he was eventually convicted, and that the

evidence presented at trial was insufficient to support his

_____

[1]     The Honorable Glenn S. Hara presided.

[2]     At the time of Bailey's trial, Hawai'i Rules of Penal Procedure
(HRPP) Rule 24(c) provided in relevant part that "[a]n alternate juror who
does not replace a regular juror shall be discharged when the jury retires to
consider its verdict."  Rule 24(c) has since been amended.  See infra n.18.

convictions.

We hold that the circuit court abused its discretion in denying Bailey's motion for mistrial, because Juror Nine's statements regarding Bailey's prior murder charge and/or conviction were not harmless beyond a reasonable doubt. Accordingly, the circuit court's judgment of conviction and sentence must be vacated. However, we further hold that the jury was properly instructed on the offense of attempted sexual assault in the first degree, and that the evidence was sufficient to support each of Bailey's convictions. Accordingly, we remand to the circuit court for a new trial on the four counts of attempted sexual assault in the first degree. See State v. Kalaola, 124 Hawai'i 43, 51, 237 P.3d 1109, 1117 (2010) (holding that retrial was not barred because "there was clearly sufficient evidence adduced to support a conviction"); State v. Feliciano, 62 Haw. 637, 644, 618 P.2d 306, 311 (1980) (holding that, where a defendant is convicted on a lesser included offense, "retrial on the greater offense is barred" under double jeopardy principles), superseded by statute on other grounds as stated in State v. Rumbawa, 94 Hawai'i 513, 517, 17 P.3d 862, 866 (App. 2001).

In light of our resolution of these issues, we do not address Bailey's arguments that the circuit court erred in denying his motion for mistrial based on the locking of the courtroom doors, and in seating an alternate juror after deliberations had begun.

## I.    Background

The following factual background is taken from the record on appeal.

## A.    Pretrial proceedings

On August 9, 2007, the grand jury returned an indictment charging Peter Kalani Bailey[3] with four counts of sexual assault in the first degree in violation of HRS § 707-730(1)(b).[4]  Each of the four counts of the indictment alleged that, on or about July 22, 2007, Bailey engaged in sexual penetration with a person who was less than fourteen years old. Count 1 alleged that Bailey engaged in "digital penetration." Count 2 alleged that Bailey engaged in "penile penetration." Count 3 alleged that Bailey engaged in "cunnilingus."  Count 4 alleged that Bailey engaged in "fellatio."

---

[3]    Although the records in this case indicate that Bailey's middle name is Kalani, his counsel asserts that his middle name is Lilikalani.

[4]    HRS § 707-730(1)(b) (Supp. 2006) provides: "A person commits the offense of sexual assault in the first degree if . . . [t]he person knowingly engages in sexual penetration with another person who is less than fourteen years old[.]"
"Sexual penetration" is defined as:

(1)    Vaginal intercourse, anal intercourse, fellatio, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs upon any penetration, however slight, but emission is not required. As used in this definition, "genital opening" includes the anterior surface of the vulva or labia majora; or

(2)    Cunnilingus or anilingus, whether or not actual penetration has occurred.
For purposes of this chapter, each act of sexual penetration shall constitute a separate offense.

HRS § 707-700 (Supp. 2006).

Prior to trial, defense counsel filed several motions in limine. Relevant to Bailey's application, defense counsel sought to exclude evidence of any prior criminal convictions. The State did not object, and the circuit court agreed to exclude evidence of Bailey's prior criminal record.

## B.    Trial

Jury selection was conducted over the course of several days. On May 12, 2008, Bailey orally moved for a mistrial on the ground that the courtroom doors were locked during a portion of jury selection on May 7, 2008. The circuit court denied Bailey's motion for mistrial, and decided to recall the jurors from the afternoon of May 7, 2008 so that the court could reexamine them.[5]

### 1.    Evidence presented at trial

The State called MM as its first witness. MM testified that she was 12 years old at the time of trial. She attended the church of the First Assembly of God, where she participated in singing on Fridays. She explained that Bailey was one of the adults in charge of the youth activities, including singing.

MM testified that Bailey telephoned her house on a Sunday during the "[n]ighttime," and asked if MM could go to the church to practice singing. MM received permission from her mother and Bailey picked her up and drove her to the church.

MM testified that after they arrived at the church,

---

[5]    Transcripts of the sessions in which the court recalled the jurors are not contained in the record on appeal.

Bailey went to the bathroom and she waited outside. After Bailey exited the bathroom, he approached MM from behind and "wrap[ped] his arm around [her] . . . stomach." He told her that she was "stiff." Bailey eventually told MM to go with him to the "copy room."

MM testified that the lights in the copy room were on. She and Bailey sat down and sang one or two songs. Bailey then asked MM to "come to him" and to "bend down on [her] knees." Bailey then massaged MM's shoulders from behind her. MM had not asked for a massage.

MM testified that Bailey then "made [her] lie on the floor" facing down with her head facing away from the door. Bailey then pulled up MM's jacket and began rubbing oil on her back. He told her that "he [had] to take off [her] bra cause the oil's gonna go on top [of] it." MM testified that Bailey unhooked her bra, and then "took off [her] shirt and jacket." Bailey continued to massage MM toward her "butt" and then removed her underwear and pants. Bailey continued to spread oil on MM and massage MM's back and butt.

Bailey then left the room for a few minutes. After Bailey returned, he told MM that her brother KM had come and that Bailey had given him some money. MM asked Bailey why he had given her brother money, but Bailey did not respond. Bailey then "undressed himself" and told MM to "face upwards." MM complied.

MM testified that she told Bailey that she had her

"menstruation [at] that time" and Bailey responded, "It's okay." Bailey then placed MM's "bra on top [of her] mouth" and turned off the lights. He then placed her bra on her eyes and "told [her] to suck on his penis." MM did not say anything. Bailey then "put his penis in [her] mouth" and "his finger up [her] vagina." Bailey also "licked [MM's] vagina." Bailey then "went down to [her] legs and he put his penis in [her] vagina." MM was "[s]cared" and thinking about whether she was "still gonna be a virgin."

MM then heard footsteps outside, and her uncle ("Uncle") opened the door. MM testified that Bailey's penis was "still on [her]" when Uncle opened the door and she was still nude. MM had "one leg . . . up on [Bailey's] shoulders and one down." When she heard the door open, MM took the bra off her eyes, and Uncle told her to "put on [her] clothes and go outside." MM heard Bailey tell Uncle that he "made a mistake." MM got dressed and went outside. MM's mother eventually arrived, and MM "asked her for water" "to take out the, um, germs from [Bailey's] penis." MM "washed [her] mouth" with the water. MM then went to a hospital and was examined.

On cross-examination, defense counsel asked MM about statements she made to a detective a day or two following the incident. MM testified that she told the detective that Bailey had "grabbed" her side after he exited the bathroom at the church. MM further testified as follows:

Q.  Okay.  And when your brother [KM] came, um, [Bailey] still had his clothes on?
A.  I don't think so.
Q.  You believe so?
A.  That he -- that he had his clothes on?
Q.  Yes.
A.  I think he had his pants off.
Q.  Okay.  So you believe at this time he didn't have a shirt on?
A.  Um.
Q.  But he had pants on?
A.  Huh?
Q.  Okay.  [Bailey], at the time [KM] came, okay, he had his pants on.  You remember that?  Yes or no?
A.  No.
Q.  He didn't have his pants on?
A.  He didn't have his pants on.
. . . .
Q.  He did not have his pants on.  Okay.  Do you remember talking to Detectives Castillas [sic].
. . . .
A.  Yes.
Q.  And do you remember telling her that, um, when [KM] came [Bailey] had his pants on but his shirt off?
A.  Um, I forget.

Defense counsel also questioned MM regarding the alleged penile penetration by Bailey as follows[6]:

Q.  Okay. . . . you said that he put his penis inside your vagina.  Correct?
A.  Yes.
Q.  Now, that was inside your body.  Correct?
A.  Yes.
. . . .
Q.  How far inside you could you feel that?
A.  Um, I dunno.
Q.  Could you feel it up towards your stomach?
A.  Oh, no.
Q.  Up towards your belly button?
A.  Um, I dunno.
Q.  You don't know?  Could you feel it right by your hips, the pressure coming in by inside you as far as up to your hips?
A.  I think so.
Q.  You think so?  So inside you on the top of your hips.
A.  Um, yeah.
Q.  Yeah? So you think that would be at least a few inches inside of you?
A.  Yes.

---

[6]  Defense counsel similarly questioned MM regarding the alleged digital penetration.  MM testified that she could feel Bailey's fingers a "[c]ouple inches" inside of her body, but "not too far[.]"

> Q.  Okay.  As -- about as much as six inches?
> A.  I dunno.  I think so.  Yeah.
> Q.  You could feel it?  You could feel it deep
> inside you?
> A.  Not really deep.
> . . . .
> Q.  Around your hips?
> A.  Yeah.
> Q.  So that would be a number of inches.
> Correct?
> A.  Yes.

MM further testified that she could "not really" use her hands freely during the incident because "his hands was kind of on top [of her] wrist kinda."

Defense counsel asked MM regarding statements she made to a police officer at the scene.  MM confirmed that she told the officer that Bailey massaged her with oil and touched her breasts.  She did not tell the officer anything else that happened to her.  Defense counsel also asked MM regarding statements she made to a nurse at the hospital where she was examined.  MM testified that she told the nurse that Bailey "did sex with [her]."

On redirect, MM testified that she could not see what Bailey was doing before KM arrived because she was laying face down on the ground.  She could not see whether he was dressing or undressing, but she thought he took his clothes off because his belt "made a jingly sound."

MM's brother KM testified as follows.  On July 22, 2007, MM told KM that Bailey called, and MM asked KM if he wanted to go to church to practice bass guitar and singing.  He did not go with her to the church.  However, when he found out that MM

had left, he wanted to go to the church because he "had a feeling like something was gonna happen" since the pastor had told him earlier that day that Bailey could not go to church because his back was sore.

When he arrived at the church, KM went toward the copy room. The door to the copy room was open and the lights were on. KM did not enter the room. He looked into the room and saw MM face down on the ground and Bailey "kneeling . . . by her head[,]" both fully undressed. Bailey was rubbing oil on MM's back. KM was mad at Bailey for rubbing the oil on his sister but did not say anything.

Bailey then put on his clothes, walked outside, and asked how KM's family was doing. After KM answered, "good[,]" Bailey gave him "like $18." KM crumpled the money and put it in his pocket without counting it. Bailey told him, "Oh, I drop your sister, like, around twenty minutes," and, "Don't tell anybody." Bailey then went back inside the room and closed the door.

KM then ran to his aunt's house "[t]o get help." KM told Uncle what he saw, and KM, his aunt and Uncle, and another relative drove back to the church. KM's relatives did not let KM go to the copy room. KM testified that, when he saw MM, she was "[s]cared and mad" and crying. KM gave the police the money that Bailey gave him.

On cross examination, KM testified that he told two

police officers he talked with at the scene that he had seen MM on the floor without any clothes, and that Bailey was massaging her with oil. Defense counsel also elicited KM's testimony that he told the officers that Bailey gave him $15, rather than $18.

Uncle testified as follows. MM is a niece of his live-in girlfriend. On the night of July 22, 2007, he spoke with KM, who was "crying and trembling." KM "told [Uncle] what happened[.]" KM had a "wad of money in his hand." Uncle drove to the church with his girlfriend, her brother, and KM. Upon arriving at the church, he ran towards the side of the church where the lights were on, yelling, "Hello?" He went to a room where he saw work boots outside the door. He opened the door and turned on the lights, and he saw Bailey "holding [MM's] legs up and licking her vagina." MM was on her back and completely nude. Bailey was also undressed. Uncle stated, "What the fuck is going on?" MM and Bailey "popped up off the ground" and Bailey said "I'm sorry." Uncle instructed MM to put on her clothes and run to her aunt. Bailey put his pants on. Uncle told him, "Don't fuckin' move[,]" and "yelled to [Uncle's] girlfriend to call the police."

Uncle then spoke with a 911 operator. He did not recall the exact details, but he cut the discussion short to "hold back" his girlfriend's "brother and [the brother's] friend[,]" who were "pretty much going crazy." Uncle was "very, very, very angry."

On cross examination, defense counsel asked Uncle whether he recalled telling the 911 operator, "[Bailey] didn't rape her, she said." Uncle testified that he did not recall saying that and that "[t]here was a lot going on at that time[.]" Defense counsel then had Uncle listen to a tape of the 911 call during recess, in order to refresh his recollection. Having listened to the tape, Uncle acknowledged that he told the 911 operator (1) "He was on top of her with her pants down touching her"; and (2) "No, he did not rape her, she said."

Uncle acknowledged that he told a police detective during a subsequent interview that MM had a rag stuffed in her mouth when Uncle walked into the room. Uncle also acknowledged that he testified at the grand jury proceedings in this case that MM had her hands tied behind her back and that Bailey was holding only one of her legs up in the air when Uncle walked into the copy room.

On redirect, Uncle testified that he did not actually see MM's hands tied behind her back, but that he assumed they were because "[w]hen she got up her hands was behind her back, and she did not freely take her hand out. She pulled it." Regarding his statement to the 911 operator that MM said that she was not raped, Uncle testified that he "must have" received this information from his girlfriend, rather than MM herself, because he had not asked MM about what happened.

Nurse Merle Endo testified as follows. She is a sexual

12

assault forensic nurse examiner, and she physically examined MM on the night of July 22, 2007. MM was scared and "crying off and on" during the examination. MM had no injuries on her body, but her skin was "slippery." She had just started her menstruation. Nurse Endo observed "quite a bit of vaginal bleeding that made it difficult to . . . get a really good look." Nurse Endo observed no "obvious [vaginal] injuries." She testified, however, that she had encountered injuries in only "[a]bout 5 percent" of approximately 148 examinations of female children she had performed. Nurse Endo also testified that she observed a "slippery substance on [MM's] labia." Nurse Endo testified that slippery substances reduce friction, "[c]aus[ing] less injury." Nurse Endo stated that the presence of blood "would also assist in having less friction."

On cross examination, Nurse Endo testified there was no injury to MM's hymen and that her final report indicated that "there were no physical findings." Nurse Endo also stated that she took samples from Bailey and MM of their fingernail scrapings, blood, saliva, pubic hair, and a genital swab, and turned them over to the detective on the case.

Detective Lorenzo Artienda testified that he spoke with Bailey as part of his investigation of the instant case. Detective Artienda testified that Bailey did not confess to "sexually touching" MM. A redacted DVD of Detective Artienda's interview with Bailey was admitted into evidence as State's

13

Exhibit 142.[7]

Detective Artienda testified that, during the course of his investigation, he received a clinical lab report detailing findings from the swabs taken by Nurse Endo, and indicating that there were no motile sperm in MM's "vaginal area," and that MM tested negative for chlamydia and gonorrhea.  Detective Artienda did not send the various swabs from MM and Bailey for DNA testing.  He testified that he has not sent any cases for DNA testing in the past and that, in this case, he did not send the swabs for DNA testing because the police "[u]sed DNA evidence for identification and [they] already had [identification]" by virtue of MM's account of events.  He also testified that he did not send samples recovered at the scene for a "blood typing test."

The State rested[8] and the defense called Officer Romeo Fuiava as its first witness.  Officer Fuiava testified as follows.  He was one of the officers dispatched to the church to investigate the incident.  When he arrived, he spoke with MM who told him that "the suspect had lifted her shirt up and rubbed some oil on her breast and fondled her."  She "couldn't" provide

---

[7]    Although the DVD was admitted into evidence during Detective Artienda's testimony, the recording was not played for the jury at that time. Instead, as discussed infra, it appears that the DVD was played for the first time during the State's closing argument.

[8]    After the State rested, Bailey moved for a judgment of acquittal, arguing that MM's testimony that Bailey inserted his penis six inches into her vagina conflicted with the physical evidence of no injuries to her vagina and hymen.  The circuit court denied the motion because, "viewed in the light most favorable to the State, the evidence is sufficient to prove each and every element of the four counts charged."

more details because "[s]he was kind of upset when she was telling [the officer] that." He did not attempt to get more information from MM because "she was upset[.]" MM did not have any visible injuries at that time.

Officer Grace Castillo testified as follows. Officer Castillo testified that she was "made aware of a case involving [MM]" on July 23, 2007, when she interviewed MM. MM had been at home prior to the interview, but Officer Castillo did not know whether MM had discussed what happened to her with her family members. Officer Castillo testified that MM told her that Bailey had taken off his shirt and pants before KM arrived. She testified that MM later said that Bailey was "half naked," but Officer Castillo was not sure whether that statement referred to the time period before or after KM arrived. She further testified that MM told her that, when she first arrived at the church, Bailey touched her on the right side of her waist. MM did not say anything about Bailey hugging her. MM also told Officer Castillo that she could "only feel what was happening to her" because Bailey had turned off the lights. Officer Castillo did not recall MM making any statements that Bailey had covered her face. Officer Castillo was not asked to provide any further details regarding her interview of MM.

Bailey did not testify, and the defense rested.[9]

_____

[9]    Bailey renewed his motion for judgement of acquittal. The circuit court denied the motion.

15

### 2. Jury instructions

The State requested that the jury be instructed on, inter alia, the included offense of attempted sexual assault in the first degree, as to each count. Defense counsel objected and argued that

> . . . the evidence in this particular case, um, as presented by the [S]tate, supports only either a [sic] actual penetration as testified to by [MM] and the other witnesses or -- and/or not. In other words, there were no other substantial steps taken. Only other substantial step that could be asserted by the [S]tate to lead to an attempt in this matter would be the disrobing of [MM], and we believe that that is insufficient on its face to go forward with the attempt counts.

The circuit court denied defense counsel's objection on the ground that "there are other acts that could be argued as substantial steps, but we'll leave that to the [S]tate to do that." The jury was instructed on each count that, if it found Bailey not guilty of sexual assault in the first degree, or was unable to reach a unanimous verdict, it "must consider" whether Bailey was guilty or not guilty of the offense of attempted sexual assault in the first degree.[10]

### 3. Closing arguments

In closing, the State argued that the witnesses' testimony supported a conviction on all four counts of sexual assault in the first degree:

> . . . [MM] told you what happened to her. She

---

[10] The jury was also instructed that "all twelve jurors must unanimously agree that the same act has been proved beyond a reasonable doubt" and that "[e]ach count and the evidence that applies to that count is to be considered separately."

was sexually assaulted when the defendant put his penis into her mouth, also known as fellatio. She was sexually assaulted when he put his fingers into her vagina, digital penetration. She was sexually assaulted when the defendant licked her vagina, cunnilingus. And, finally, she was sexually assaulted when the defendant put his penis into her vagina, penile penetration.

[MM's] testimony doesn't stand alone. You heard from three other eye witnesses that corroborate and support what she told you --her brother, [KM]; her uncle, []; and the defendant himself.

[KM] told you that when he went to the copy or office room after arriving at the church, he looked inside the door of the copy room. What did he see? He saw his sister, [MM], lying on the floor. He also told you that he saw the defendant kneeling beside [MM] on the floor. And he was rubbing [MM]. Most importantly, he's told you that they were both naked.

[Uncle], he told you that when he went to the room after being alerted by [KM] that he saw [MM] on the floor. The defendant was also on the floor, and they were both naked. But he also told you that he saw the defendant holding [MM's] legs in the air, and he was licking her vagina. Cunnilingus.

Finally, the defendant. He told Detective Artienda basically, regarding the specific incident with [MM], he doesn't remember. But when you look at state's exhibit [142] that has portions of his interview with Detective [] Artienda, you'll find he has a very detailed recollection of what happened before he picked up [MM], and he remembers as soon as [Uncle] comes into the room and sees what's going on. He conveniently is forgetting what happens during the sexual assault.

Does that make sense? You're gonna say no. But what's important about what the defendant tells Detective Artienda is that when Uncle [] comes into the room, he admits, yes, he's on the floor, and, yes, [MM] is naked on the floor as well.

The State then played the DVD of Bailey's interview with Detective Artienda for the jury.[11]

Defense counsel's closing argument focused on alleged inconsistencies in the testimony of the State's witnesses. For

---

[11] Although the DVD itself is contained in the record on appeal, the record does not contain a transcript of the interview. In brief summary, during the redacted interview, Bailey recounted what he had done on the morning of the incident in some detail, but stated that he had no memory of getting to the church or of what had occurred there. He did not remember anything but seeing MM, who he thought was naked, after her family arrived. He stated that he was sorry and would tell MM he was sorry if he saw her.

example, defense counsel argued that Uncle told the 911 operator that, when he entered the copy room, Bailey had his pants off. However, defense counsel noted that Uncle did not inform the 911 operator that Bailey was licking MM's vagina, that MM had a rag in her mouth, or that MM's hands were tied behind her back, as he testified before the grand jury. Defense counsel also pointed out that Uncle had told the 911 operator that Bailey did not rape MM. Defense counsel also argued that MM's testimony was inconsistent with that of Uncle, because MM testified that Bailey's penis was inside of her when Uncle arrived, whereas Uncle testified that Bailey was licking her vagina.

In addition, defense counsel argued that Nurse Endo's findings during the physical examination were inconsistent with MM's account of the incident. For example, defense counsel argued that MM stated that "Bailey had inserted his penis inside of her up to the portion of her hips a number of inches, where it sat doing nothing for five to ten minutes. The lack of physical evidence in those conditions with that testimony is reasonable doubt."

In rebuttal closing, the State argued that it was "reasonable" for MM "to get the timing of the different situations mixed up" "because of her situation she's in. Twelve-year-old in the dark, being raped."

C.  **Jury deliberations**

On May 28, 2008, after the parties completed their

closing arguments, the circuit court provided additional instructions to the jury and discharged the alternate jurors. After the twelve original jurors left the courtroom and entered the jury room, the circuit court reminded the alternate jurors not to discuss the case with anyone until they had been "finally dismissed as alternate jurors[.]"  The circuit court further instructed the alternate jurors as follows:

> [THE COURT:] First of all, you will be excused, and you can basically go about whatever it is that is your normal lifestyle from now on.  If you have some time, I would like to meet all of you in chambers and express my personal thanks, but I also need you to leave your contact information with the bailiff before you leave.  It may be, depending on the outcome of this trial, that you may be required for further fact finding as alternate jurors in some other proceedings in this case.  We will not know that until we have the verdict.  So for that reason, we need your contacted [sic] information so we can tell you what further services that may be required in the future.  Okay? Any questions?
> THE ALTERNATE JURORS: (Shaking heads.)
> THE COURT:  Okay, fine.  So if you'll see me in chambers, I'd like to thank all of you.

The jury did not reach its verdict on May 28, 2008, and resumed deliberations the next day.  At 11:30 a.m. on May 29, 2008, approximately 4 hours and 30 minutes into its deliberations, the jury sent its Communication #1 to the circuit court, stating, "We would like to speak to Judge Hara regarding information that a juror has that has affected our deliberations."  Upon a request for elaboration from the circuit court, the jury responded in its Communication #2:

> It was brought up that a juror has knowledge of the defendant having a prior charge or has been accused of another crime that some of the remainder of the jurors believe may have introduced a bias in that juror, and we are concerned that we have been compromised.  We would like to speak to Judge Hara for

19

direction on how to proceed.

The circuit court instructed the jury to suspend its deliberations. The circuit court then proceeded to voir dire each juror outside of the presence of the other jurors, beginning with the foreperson. The foreperson, Juror Eight, explained that Juror Nine had stated

> that she was affected by knowledge of a charge against [Bailey] for attempted murder or something of that nature. She didn't elaborate into that. We stopped right away as soon as it was brought up. . . . [S]he stated that she had a hard time believing the piece of evidence that we were reviewing at the time. . . . She did not state anything further. We didn't allow it to go any further.

Juror Eight stated that he had no other knowledge of any other charges against Bailey, that Juror Nine's statements would not affect his ability to be a fair and impartial juror in this case, and that he could disregard Juror Nine's statements and base his decision solely on the evidence and the court's instructions. On examination by defense counsel, Juror Eight stated that the jurors had been reviewing Bailey's interview with Detective Artienda at the time Juror Nine made the statements.

Juror Nine was then called and stated:

> I know what I did is wrong. Was just blurted out. And I wasn't using that to cloud anybody's mind. And it just came out and I'll admit what I did.
> . . . .
> Well I just -- we were discussing -- I don't know if I can say, we were discussing, um, basically a part of [] Bailey not knowing what had happened. And I was getting frustrated because everybody's focus point was on that.
> . . . .
> And what I did say was that, "Maybe he does know what he's doing or not because he's been through that process before." That's what I said.
> . . . .
> And I said, "He's been in trouble before." And

20

then they questioned me again, "with what?"  And I
said, "From what I know, it was on a murder charge."
And then they asked me, you know, well what do I --
what do I know -- if I know where he stands now.  I
said, "That I'm not sure."  And I know I was wrong for
saying that.

Juror Nine pointed out that she had explained to the circuit court during jury selection, "that [she] knew he got into trouble before and she somewhat knew about the case."  However, Juror Nine explained that "as time went by I did remember what [the prior charge] was for."  On examination by defense counsel, Juror Nine stated that she "did say [to the other jurors] that [she] was sure it was for a murder charge, and right there we all ceased."

Juror One was called and stated that she had heard Juror Nine's statements, but that she "just kind of blocked it out cause [she] didn't want to hear."  She stated that Juror Nine "heard that he might be on parole, she's not sure.  And something about murder came up.  But she kind of mumbled that so [Juror One was] not exactly sure."  Juror One stated that she could still be fair and impartial, she would base her decision solely on the evidence and the law as instructed by the circuit court, and she could disregard Juror Nine's statements.

Jurors Two, Three, Five, Six, Seven, Ten, Eleven, and Twelve stated that they had heard Juror Nine's statements,[12] but

_____

[12]    There was some variation in what the jurors recalled about Juror Nine's statements.  For example, some of the jurors recalled that Juror Nine stated Bailey had a prior charge for attempted murder, while others recalled that Juror Nine stated Bailey had a prior charge for murder, and still others recalled that she said Bailey had a prior conviction.  One juror recalled that "something about murder came up" and that Juror Nine stated Bailey was on

could disregard them and decide the case solely on the evidence and the law as instructed by the circuit court. These jurors also stated that they could still be fair and impartial.

Juror Five noted that Juror Six

> seemed, um, I guess like it would be hard for him to overlook it. I know that he was probably -- probably made the strongest response. I can't remember exactly what he said. But I know he essentially just wanted to stop everything and knew that we couldn't continue. And I know he said that it would be hard for him to not let it affect him. I believe he was the -- he had the strongest response.

There was some ambivalence in Juror Four's testimony as to whether he could remain fair and impartial:

> Q. Okay. [Juror Four], how about you, are you able to disregard what [Juror Nine] might have said and not have that play a part in your further deliberations in your decision as a juror in this case?
> A. I don't think so.
> Q. You don't think so?
> A. No.
> Q. Okay. So what she said would affect your decision in this case?
> A. It wouldn't change how I felt in the case but, you know, my -- what I thought my decision was, before she said that, remained the same.
> Q. Okay. But my question is this --
> A. Yes.
> Q. -- can you disregard what she said and not have that affect your ability to be fair and impartial in this case? Can you make your decision based on your evaluation on the evidence in this case and the law that I gave you, and not consider her statements? Or would her statements now --
> A. I'm not sure.
> Q. -- have a result in your decision?
> A. Yeah.
> Q. You're not sure?
> A. I'm not sure.

However, on further questioning by defense counsel,

---

parole, while another juror recalled that Juror Nine had indicated Bailey was on probation.

Juror Nine, however, stated she told the other jurors that Bailey had a prior "murder charge." She further stated that she told the other jurors that she did not know "where he stands now."

Juror Four stated that he could still keep an open mind and potentially reevaluate his position on the case. Juror Four stated, "I think I can make an informed decision still." On further questioning by the circuit court, Juror Four stated, "I believe that I made a decision now that I could continue on and make a decision without letting that affect me."

Juror Six stated that "at first [he] thought he wouldn't be able to" disregard Juror Nine's comments, but that, "after it sat in for awhile, I thought it doesn't matter what she said about it."

Juror Twelve stated that Juror Nine's statements "ha[d] an effect on me. But I honestly believe that I can -- I can set it aside. I can't say I didn't hear it and didn't make an effect on me." Juror Twelve further stated that he could "separat[e] that from all the rest of the evidence that's been given."

At the conclusion of the voir dire, Bailey reserved making any motions. The circuit court allowed the parties "at least a day or two" to consider whether Juror Nine should be dismissed. On June 2, 2008, Bailey orally moved for a mistrial, on the ground that he was denied his right to a fair and impartial jury as a result of Juror Nine's statements. Bailey contended that the statements were prejudicial and commented on his credibility. Bailey further argued that the statements were not harmless beyond a reasonable doubt because: (1) a juror indicated during voir dire that there was a vote as to whether to

notify the circuit court of Juror Nine's statements, which indicated that some of the jurors did not wish to disclose the statements to the circuit court; (2) one of the jurors had "an extremely emotional reaction" to the statements;[13] (3) another juror "expressed that [he] would not be able to put that aside at first, and then later changed it[,] . . . [n]ot saying that he could necessarily be fair, but saying that he could make an informed decision";[14] and (4) Bailey was facing a possible life sentence. Bailey also argued that the circuit court could not replace Juror Nine with an alternate juror under HRPP Rule 24(c).

The State conceded that Juror Nine's statements were prejudicial. However, the State argued that "the [c]ourt's voir dire of the other eleven jurors did indicate that they could still render a fair and impartial verdict."

The circuit court denied Bailey's motion for mistrial, stating:

> Based on the [c]ourt's voir dire of the Jury and their responses, and basically I think their fast response with respect to communicating with the [c]ourt as soon as they felt that there was some exposure to unpermitted information, that -- and the fact that they did cease deliberation after attempting to communicate with the Court through written communication, that the amount of prejudice, if any, was limited by that fairly quick response.
> Also, based on the responses from each of the jurors it does not appear that what was revealed to them by [Juror Nine] at this point will affect the eleven other jurors. And the [c]ourt's going to make that finding beyond a reasonable doubt. And find that any misconduct, if any, is harmless beyond a reasonable doubt and deny [Bailey's] motion for a

---

[13]    This contention was likely in reference to Juror Six.

[14]    This contention was in reference to Juror Four.

mistrial.

The circuit court dismissed Juror Nine and seated an alternate juror in her place. The circuit court confirmed that the alternate juror had not been exposed to any media accounts relating to the case, had not discussed the case with anyone, and felt she could "substitute in" for another juror. The circuit court did not ask the original eleven jurors whether they felt that they could disregard their prior deliberations and begin their deliberations anew. The circuit court instructed the original eleven jurors to "not consider [Juror Nine's] statements during your deliberations for any reason or purpose." The circuit court then instructed the entire reconstituted jury "to disregard [its] prior deliberations and to start [its] deliberations anew." Finally, the circuit court instructed the jury to "elect one of your members as a foreperson" before beginning deliberations. The jury then recommenced its deliberations.

It appears that the reconstituted jury deliberated for approximately three days. On the third day of its deliberations, the jury sent the circuit court its Communication #3, which read:

> We have 2 questions. 1) If we cannot decide on a verdict on one or more counts, does that mean that any counts that we can decide upon, are thrown out? 2) Can a juror refuse to vote on a charge?

In response, the circuit court instructed the jury: "The jury may at any time during its deliberations return a verdict or verdicts with respect to one or more counts to which

25

you can unanimously agree even though you may not be able to reach a unanimous verdict as to all counts."

The jury returned its verdict on June 5, 2008, finding Bailey guilty on four counts of the included offense of attempted sexual assault in the first degree.

## E.    Post-trial proceedings and judgment

On June 12, 2008, Bailey filed his motion for new trial.  In his memorandum in support of the motion, Bailey argued, inter alia, that Juror Nine's comments were prejudicial and not harmless beyond a reasonable doubt.  He also contended that the circuit court erred in relying on the jurors' statements during voir dire because the jurors had "committed their time and considerable effort as jurors in this case" and "could not have responded in any other way but to say they would continue" to be fair.  The State argued that any prejudice was cured by the court's instructions to the reconstituted jury.

On June 24, 2008, during a hearing on Bailey's motion for new trial, Bailey argued that, pursuant to State v. LaRue, 68 Haw. 575, 722 P.2d 1039 (1986), and Hawai'i Rules of Evidence (HRE) Rule 606(b),[15] the circuit court could not inquire into the

_____

[15]    HRE 606(b) provides:

> Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. Nor may the juror's affidavit or evidence of any statement by the juror indicating an effect of

26

mental processes of the jurors by asking them whether they could be fair and impartial despite Juror Nine's statements. In addition, Bailey orally renewed his motion for judgment of acquittal based on insufficiency of the evidence.

The circuit court denied Bailey's motion for a new trial.[16] The circuit court's July 9, 2008 Findings of Fact, Conclusions of Law and Order Denying Defendant's Motion for New Trial provided in relevant part as follows:

> FINDINGS OF FACT
> . . . .
> 7. Each juror stated although they had heard what was said, he or she could be a fair and impartial juror.
> 8. On June 2, 2008, the juror who made the statement was discharged and an alternate took her place.
> . . . .
> CONCLUSIONS OF LAW
> 1. Counsel had been given adequate opportunity to questions [sic] each juror regarding the statement(s) made by the discharged juror.
> 2. The [c]ourt was convinced that the remaining eleven jurors could be fair and impartial.

On July 28, 2009, Bailey filed another motion for judgment of acquittal. In his memorandum in support of the motion, Bailey argued that the jury must have rejected MM's testimony regarding penetration because it found him not guilty on the sexual assault offenses. Bailey argued that the remaining alleged acts (undressing MM, rubbing her with oil, and massaging her) were legally insufficient to demonstrate specific intent to

---

this kind be received.

[16]    The circuit court did not specifically address the renewed motion for judgment of acquittal, but stated that the motion was "subsumed under the [c]ourt's decision as to the new trial."

sexually assault MM.

The circuit court denied the motion for judgment of acquittal at an August 5, 2009 hearing, stating that:

> . . . [MM] may have come across to the jury as someone who may have been naive as to what was occurring.  And it is I think within the [j]ury's province to have either rejected some of her testimony and accepted some of it.  And if they rejected the testimony as to the actual penetration, but accepted the fact there was apparent preparation for the sex acts alleged in the indictment, then certainly there was sufficient evidence for the [j]ury to convict [Bailey].

On December 10, 2009, the circuit court issued its Judgment of Conviction and Sentence, convicting Bailey on four counts of attempted sexual assault in the first degree.  The circuit court sentenced Bailey to a 20-year term of incarceration on each count, "to be served concurrently with each other, consecutive to the sentence imposed in First Circuit Court in Cr. No. 52830."  Bailey timely filed his notice of appeal on January 5, 2010.

**B.   Appeal**

In his opening brief, Bailey raised five points of error, three of which are relevant here.  Specifically, Bailey asserted that the circuit court erred in (1) denying his motion for new trial because Juror Nine's misconduct tainted the jury and prejudiced his constitutional right to a fair trial; (2) instructing the jury on the included offense of attempted sexual assault in the first degree because there was no basis in the evidence for the instruction; and (3) denying his motion for judgment of acquittal because there was not substantial evidence

to support his convictions.[17]

In its Answering Brief, the State argued that (1) the circuit court properly denied Bailey's motion for new trial because the voir dire indicated that Juror Nine's comments had no impact on the impartiality of the other jurors; (2) there was a rational basis in the evidence for instructing the jury on the included offense of attempted sexual assault in the first degree; and (3) the testimony presented at trial constituted substantial evidence to support Bailey's convictions.

In his Reply Brief, Bailey argued that there was not substantial evidence to support his convictions because "[t]here was absolutely no evidence presented that [he] had attempted, but not completed the alleged acts of sexual penetration." Bailey similarly argued that the circuit court erred in instructing the jury on the included offenses of attempted sexual assault in the first degree because there was "no rational basis in the evidence for the jury to acquit [him] of the charged offenses and convict him of attempt to commit the charged offenses."

The ICA held that the circuit court did not clearly err in denying Bailey's motion for a new trial. Bailey, 2011 WL 2520275, at *1-3. The ICA noted that "[e]ach of the jurors testified that they could disregard what Juror [Nine] had said

---

[17]    As noted supra, we do not address Bailey's arguments that the circuit court erred in seating an alternate juror after deliberations had begun, and in denying his motion for mistrial based on the locking of the courtroom doors.

29

about Bailey's prior criminal conduct and make their decision based on the facts." Id. at *2. The ICA further noted that (1) the circuit court dismissed Juror Nine; (2) the circuit court instructed the remaining jurors to disregard Juror Nine's statements and to begin deliberations anew; and (3) the evidence against Bailey was overwhelming. Id. at *2-3.

In addition, the ICA held that the circuit court properly instructed the jury on the included offense of attempted sexual assault in the first degree because "the witness testimony" supported the instruction. Id. at *4. The ICA also held that there was sufficient evidence to support Bailey's convictions based on the testimony of MM, KM, and Uncle, and statements Bailey made to Uncle and Detective Artienda immediately following the incident with MM. Id. at *1. The ICA concluded that "[t]he fact that the jurors did not believe everything that the witnesses testified to does not prevent them from finding Bailey guilty of a lesser included offense." Id.

Accordingly, the ICA affirmed the circuit court's December 10, 2009 Judgment of Conviction and Sentence. Id. at *5. The ICA entered its judgment on May 16, 2011. Bailey timely filed his application for a writ of certiorari on August 10, 2011, in which he raises the following questions:

> 1. Whether the ICA gravely erred in holding that there was substantial evidence to support Bailey's convictions?
> 2. Whether the ICA gravely erred in holding that the circuit court did not abuse its discretion in denying Bailey's motion for a new trial based on juror misconduct?

3. Whether the ICA gravely erred in holding that the circuit court's violation of [Hawaiʻi Rules of Penal Procedure (HRPP)] Rule 24(c) by seating an alternate juror after deliberations had already commenced was harmless beyond a reasonable doubt?
4. Whether the ICA gravely erred in holding that there was a rational basis for instructing the jury on the included offenses of attempted sexual assault in the first degree?
5. Whether the ICA gravely erred in holding that the locking of the courtroom doors during voir dire did not violate Bailey's constitutional right to a public trial?

(Internal brackets omitted).

The State did not file a response.

## II. Standards of Review

### A. Motion for new trial

In the instant case, the ICA held that the circuit court's "conclusion that Bailey was not deprived of a fair trial by twelve impartial jurors . . . is [] reviewed under the clearly erroneous standard." Bailey, 2011 WL 2520275, at *3 (emphasis added) (citing State v. Furutani, 76 Hawaiʻi 172, 180, 873 P.2d 51, 59 (1994)). However, both Bailey and the State have argued that the circuit court's decision on Bailey's motion for a new trial should be reviewed for abuse of discretion.

Furutani can be read to suggest that both the clearly erroneous and abuse of discretion standards apply to our review of a circuit court's decision on a motion for new trial. Compare 76 Hawaiʻi at 180, 873 P.2d at 59 ("[T]he ultimate question in the present appeal is whether the circuit court committed an abuse of discretion when it concluded that 'possible' jury misconduct at voir dire, in combination with jury misconduct

31

**FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER***

during deliberations, deprived Furutani of a trial by twelve fair and impartial jurors.") (emphasis added) <u>with</u> <u>id.</u> at 185, 873 P.2d at 64 ("[W]e hold that the circuit court's COL that 'the possible misconduct at voir dire . . . deprived [Furutani] of a trial by twelve fair and impartial jurors' is not <u>clearly erroneous</u>.") (emphasis added) (some brackets added and some in original).  However, this court has repeatedly stated that a trial court's decision on a motion for new trial or a motion for mistrial is reviewed for abuse of discretion.  <u>See, e.g.,</u> <u>Furutani</u>, 76 Hawai'i at 178-79, 873 P.2d at 57-58; <u>State v. Kim</u>, 103 Hawai'i 285, 290, 81 P.3d 1200, 1205 (2003); <u>State v. Lagat</u>, 97 Hawai'i 492, 495, 40 P.3d 894, 897 (2002).  This court has explained:

> As a general matter, the granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion.  The same principle is applied in the context of a motion for new trial premised on juror misconduct.  The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

<u>State v. Yamada</u>, 108 Hawai'i 474, 478, 122 P.3d 254, 258 (2005) (citing <u>Furutani</u>, 76 Hawai'i at 178-79, 873 P.2d at 57-58).

> Moreover,

> . . . Because the right to an impartial jury in a criminal trial is so fundamental to our entire judicial system, it therefore follows that a criminal defendant is entitled to twelve impartial jurors.  Thus, the trial court must grant a motion for new trial if any member (or members) of the jury was not impartial; failure to do so necessarily constitutes an abuse of discretion.

<u>Furutani</u>, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994) (citations,

quotation marks and brackets omitted).

Accordingly, we review the circuit court's decision on Bailey's motion for a new trial for abuse of discretion.

## B.   Jury instructions on included offenses

This court has stated:

> The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. In other words, error is not to be viewed in isolation and considered purely in the abstract.

State v. Kassebeer, 118 Hawaiʻi 493, 504, 193 P.3d 409, 420 (2008) (internal quotation marks, citations, and brackets omitted) (quoting State v. Mainaaupo, 117 Hawaiʻi 235, 247, 178 P.3d 1, 13 (2008)).

Moreover,

> trial courts must instruct juries as to any included offenses when "there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense[.]"

State v. Haanio, 94 Hawaiʻi 405, 413, 16 P.3d 246, 254 (2001) (quoting HRS § 701-109(5) (1993)).

## C.   Sufficiency of the evidence

We review the sufficiency of evidence on appeal as follows:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but

> whether there was substantial evidence to support the
> conclusion of the trier of fact.

State v. Kalaola, 124 Hawaiʻi 43, 49, 237 P.3d 1109, 1115 (2010)

(brackets in original) (quoting State v. Richie, 88 Hawaiʻi 19,

33, 960 P.2d 1227, 1241 (1998)).

"'Substantial evidence' as to every material element of

the offense charged is credible evidence which is of sufficient

quality and probative value to enable a person of reasonable

caution to support a conclusion." Id. (quoting Richie, 88

Hawaiʻi at 33, 960 P.2d at 1241).

### III. Discussion

For the reasons set forth below, we hold that the

circuit court abused its discretion in denying Bailey's motion

for new trial because Juror Nine's statements substantially

prejudiced Bailey's right to a fair trial by twelve impartial

jurors. We further hold that the jury was properly instructed on

the included offense of attempted sexual assault in the first

degree, and that there was substantial evidence to support

Bailey's conviction on all four counts. Accordingly, we vacate

the ICA's judgment, and the circuit court's judgment of

conviction and sentence, and remand for a new trial on the four

counts of attempted sexual assault in the first degree.[18]

---

[18] Although we do not address Bailey's argument regarding HRPP Rule 24(c), we note that Rule 24(c) has been amended since Bailey's trial, and now allows alternate jurors to "be held in recess until a verdict is received" and to "replace[] a regular juror after deliberations have begun[.]" Accordingly, we take this opportunity to caution the trial courts against ex parte communications with alternate jurors who have not been finally discharged. See State v. Estrada, 69 Haw. 204, 227, 738 P.2d 812, 827-28 (1987) (noting, where the judge entered the jury room without the presence or consent of

34

## A.    Juror Nine's statements violated Bailey's right to a fair and impartial jury

Bailey argues that the circuit court abused its discretion in denying his motion for new trial, which was made in relation to Juror Nine's statements, because (1) the evidence against Bailey was not overwhelming; (2) the circuit court was not permitted to consider the juror's responses during voir dire regarding how they were affected by the statements; (3) "it was unavoidable" that the statements would "rouse the jury to overmastering hostility"; and (4) the circuit court's instruction to disregard the statements was insufficient to cure any prejudice.

This court has explained:

> The sixth amendment to the United States Constitution and article I, section 14 of the Hawaiʻi Constitution guarantee the criminally accused a fair trial by an impartial jury.  If any juror was not impartial, a new trial must be granted.  However, not all juror misconduct necessarily dictates the granting of a new trial. A new trial will not be granted if it can be shown that the jury could not have been influenced by the alleged misconduct.

Kim, 103 Hawaiʻi at 290-91, 81 P.3d at 1205-06 (citations and footnotes omitted).

This court has articulated the following "conceptual framework" for analyzing a claim that juror misconduct prejudiced

_____

defense counsel, that ex parte communications with jurors "are strictly prohibited," but declining to adopt a per se rule that such communications are reversible error).

In the instant case, the circuit court judge asked all of the alternate jurors to meet with him in chambers after they were discharged.  See supra, pages 22-23.  However, the record does not reflect whether or to what extent the alternates did, in fact, meet with the judge in chambers.

35

a defendant's right to a fair trial[19]:

> [W]hen a defendant in a criminal case claims a deprivation of the right to a fair trial by an impartial jury, the initial step for the trial court to take is to determine whether the nature of the alleged deprivation rises to the level of being substantially prejudicial. If it does not rise to such a level, the trial court is under no duty to interrogate the jury. And whether it does rise to the level of substantial prejudice is ordinarily a question committed to the trial court's discretion.
>     Where the trial court does determine that such alleged deprivation is of a nature which could substantially prejudice the defendant's right to a fair trial, a rebuttable presumption of prejudice is raised. The trial judge is then duty bound to further investigate the totality of circumstances surrounding the alleged deprivation to determine its impact on jury impartiality. The standard to be applied in overcoming such a presumption is that the alleged deprivation must be proved harmless beyond a reasonable doubt.
>     The defendant bears the initial burden of making a prima facie showing of a deprivation that could substantially prejudice his or her right to a fair trial by an impartial jury. But once a rebuttable presumption of prejudice is raised, the burden of proving harmlessness falls squarely on the prosecution.

Furutani, 76 Hawai'i at 180-81, 873 P.2d at 59-60 (formatting altered) (citations, ellipses, internal quotation marks and brackets omitted).

In the instant case, Bailey met his burden of "making a prima facie showing of a deprivation that could substantially prejudice his or her right to a fair trial by an impartial jury." See id. The voir dire of Juror Nine indicates that her statements led to a brief discussion by the jurors concerning Bailey's prior criminal record, which had been excluded from the

---

[19]    Although this framework has been utilized in cases in which the court was advised of alleged juror misconduct after the jury had returned its verdict, see, e.g., Furutani, 76 Hawai'i at 177, 873 P.2d at 56, it is equally applicable in the circumstances of the instant case, where the issue of juror misconduct was raised during jury deliberations.

evidence pursuant to Bailey's motion in limine. For example, Juror Nine testified that, when she stated Bailey had "been in trouble before," other jurors asked her "with what?" and whether she knew where Bailey "stands now."[20] In addition, Juror Nine's testimony indicates that her statements were used as a circumstance against Bailey. Specifically, Juror Nine told the other jurors that she did not believe Bailey's statement to Detective Artienda that he did not know what had happened, since he had "been in trouble before." See id. at 185, 873 P.2d at 64 (noting that a legal presumption of prejudice does not arise from a juror's "mere verbalization of or casual reference to" a defendant's failure to testify and that, in order to constitute substantial prejudice, such statements "must amount to a discussion by the jurors or be used as a circumstance against the accused").

Accordingly, the circuit court's decision to investigate the impact of Juror Nine's statements on juror impartiality was proper. See id. at 181, 873 P.2d at 60; see also State v. Keliiholokai, 58 Haw. 356, 357-60, 569 P.2d 891, 893-96 (1977) (citation omitted) (noting that evidence of the defendant's prior convictions for robbery would not have been admissible at trial due to its prejudicial nature, and that the circuit court accordingly erred in failing to voir dire the jury

---

[20] However, other jurors indicated that they "stopped right away as soon as [Bailey's prior criminal record] was brought up" and that they "didn't allow it to go any further."

regarding whether they had read a newspaper article that discussed the convictions). Upon its investigation, the circuit court concluded that Juror Nine's statements were harmless beyond a reasonable doubt. However, for the reasons set forth below, we conclude the State did not meet its burden of proving harmlessness. See Furutani, 76 Hawaiʻi at 185, 873 P.2d at 64.

The determination of whether Juror Nine's statements were harmless beyond a reasonable doubt "requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." See State v. Tuua, 125 Hawaiʻi 10, 13, 250 P.3d 273, 276 (2011) (citation and quotation marks omitted) (defining the harmless beyond a reasonable doubt standard). In circumstances involving an alleged deprivation of the right to an impartial jury, we consider the "totality of the circumstances surrounding the alleged deprivation to determine its impact on jury impartiality." Furutani, 76 Hawaiʻi at 181, 873 P.2d at 60 (citation omitted).

Juror Nine's comment that she did not believe Bailey's statement to Detective Artienda due to his criminal record indicates that Juror Nine was prejudiced against Bailey and could not continue as a fair and impartial juror. Juror Nine's statements were also highly prejudicial and inflammatory in nature, and were therefore likely to impact the impartiality of the remaining jurors. First, Juror Nine's statements indicated

38

that, because of his criminal record, Bailey was not credible in stating to Detective Artienda that he did not recall what happened with MM. In addition, Juror Nine's statements indicated that Bailey had been charged with and/or convicted of murder.

This court has recognized in other contexts that inadvertent and inadmissible statements concerning prior murder offenses can be "so prejudicial as to deprive the defendant of his constitutional right to a fair trial." State v. Pokini, 57 Haw. 17, 21, 548 P.2d 1397, 1399-1400 (1976); see also State v. Hamala, 73 Haw. 289, 291, 834 P.2d 275, 276 (1992) (noting, in evaluating a double jeopardy issue, that this court had previously concluded that testimony that the defendant had previously shot two people "was highly prejudicial"), overruled on other grounds by State v. Rogan, 91 Hawaiʻi 405, 423 n.10, 984 P.2d 1231, 1249 n.10 (1999).[21] For example, in Pokini, this court vacated Pokini's conviction for conspiracy to murder and remanded for a new trial, where a prejudicial transcript was erroneously admitted into evidence over defense counsel's objection. 57 Haw. at 18, 25, 548 P.2d at 1398, 1402. In the transcript, an accomplice testified that he had seen Pokini carry out two other murders, and that he and Pokini had planned to murder other witnesses. Id. at 19-20, 548 P.2d at 1399. The

---

[21] Although it appears that the court did not voir dire the jury on the effect of the prejudicial statements in these cases, and these cases did not involve juror misconduct, they nonetheless demonstrate that this court has recognized that evidence concerning involvement in prior murders may be substantially prejudicial.

transcript also contained other detailed references to these crimes. Id. at 21, 548 P.2d at 1399. This court stated that the crimes referenced in the transcript "may generate insurmountable prejudice to the cause of the accused," and "were so prejudicial as to deprive the defendant of his constitutional right to a fair trial."[22] Id. at 21, 548 P.2d at 1399-1400 (quotation marks and citations omitted).

Although this court has held that the erroneous admission of prior criminal conduct may be harmless if the trial court gives a cautionary instruction and the evidence against the defendant is overwhelming, see, e.g., State v. Loa, 83 Hawaiʻi 335, 354, 926 P.2d 1258, 1277 (1996), this court has also recognized that such an instruction may be insufficient to cure the effect of improper evidence that is highly prejudicial, Hamala, 73 Haw. at 291-92, 834 P.2d at 276 (recounting this court's prior unpublished memorandum opinion, which vacated the defendant's conviction on second degree murder due to prejudicial testimony concerning previous murders allegedly committed by the defendant, and noting that "the testimony regarding prior bad acts elicited by the prosecutor was highly prejudicial and that

---

[22] Although Pokini involved a prosecution witness and, as noted by this court, "[t]he prosecutor was fully aware of the contents of the transcript," id. at 22, 548 P.2d at 1400, this court's holding that evidence of prior convictions "may generate insurmountable prejudice" has been applied in other circumstances. See, e.g., State v. Kahinu, 53 Haw. 536, 549, 498 P.2d 635, 643-44 (1972) ("Such wielding of the 'evidential harpoon' may compel the trial court to declare a mistrial, whether it appears that the testimony was deliberately induced by the prosecutor, or through the overzealousness of the police witness[.]") (citations omitted); State v. Keliiholokai, 58 Haw. at 360, 569 P.2d at 895-96 (concluding that a defendant may suffer prejudice due to newspaper articles concerning prior convictions).

no curative instruction could suffice").

In the instant case, although there was substantial evidence to support Bailey's conviction, there were also inconsistencies in the testimony of MM, KM, and Uncle, and arguable inconsistencies between the testimony of MM and the physical evidence.  See infra Part III.C.  Accordingly, the evidence was not strong enough to overcome the substantial prejudice created by Juror Nine's statements, even though the circuit court advised the remaining jurors to disregard Juror Nine's statements in resuming their deliberations.  See Hamala, 73 Haw. at 291-92, 834 P.2d at 276; cf. Loa, 83 Hawaiʻi at 354, 926 P.2d at 1277.

In addition, the voir dire indicates that Juror Nine's statements had an effect on several of the remaining jurors.[23] For example, Juror Four initially stated that he was "not sure" whether he could disregard what Juror Nine said.  And Juror Twelve stated that he "can't say [he] didn't hear it and [it] didn't make an effect on [him.]"  Although each of the jurors

---

[23]    Bailey argues that this court cannot consider the jurors' statements made during voir dire regarding their ability to fairly and impartially decide the case.  In support of this argument, Bailey cites to Kim, 103 Hawaiʻi at 291, 81 P.3d at 1206, for the proposition that "the court cannot consider the jurors' testimony as to the effect of the improper statement upon them."  (Citation and quotation marks omitted).  This statement in Kim concerned the interpretation of Hawaiʻi Rules of Evidence (HRE) Rule 606(b).  However, the plain language of HRE 606(b) limits only what a court may consider in inquiring into the "validity of [a] verdict or indictment."  In the instant case, the circuit court conducted voir dire prior to the jurors returning their verdicts.  Accordingly, the circuit court did not inquire into the "validity of [a] verdict or indictment," but rather inquired whether the jurors could remain fair and impartial going forward, and the prohibition set forth in HRE 606(b) is inapplicable.

ultimately stated that they could remain fair and impartial, their initial reactions reflect the highly prejudicial nature of Juror Nine's statements. Moreover, Juror Six recalled that Juror Nine stated, "I've got some inside information that you guys don't have and that you should know about." The nature of this statement may have led the other jurors to believe the information Juror Nine possessed was particularly credible or reliable.

Cases from other jurisdictions further support the conclusion that the circuit court abused its discretion in denying Bailey's motion for new trial. For example, in Marshall v. United States, 360 U.S. 310, 311-13 (1959), the United States Supreme Court held that a new trial should have been granted, where "a substantial number of jurors" were exposed to newspaper articles detailing the defendant's prior convictions. The Court noted that the trial judge conducted an inquiry, and determined that seven jurors had seen the articles. Id. at 312. "Each of the seven told the trial judge that he would not be influenced by the news articles, that he could decide the case only on the evidence of record, and that he felt no prejudice against petitioner as a result of the articles." Id. Accordingly, the trial judge denied the defendant's motion for mistrial. Id.

In determining that a new trial should have been granted, the Court recognized that "[t]he trial judge has a large discretion in ruling on the issue of prejudice resulting from the

42

reading by jurors of news articles concerning the trial." Id. (citation omitted). However, the Court noted that the jurors were exposed to "information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence." Id. Accordingly, the Court reversed the defendant's conviction and granted a new trial pursuant to the court's supervisory power. Id. at 313; see also State v. Yurk, 638 P.2d 921, 927-28 (Kan. 1982) (reversing and remanding for a new trial, where a single juror read a newspaper article that detailed the defendant's prior criminal record and admitted that "the prior charges and convictions 'bothered' him and might affect his judgment[,]" even though he eventually stated he thought he could render an impartial decision); State v. Craven, 298 N.E.2d 597, 599-600 (Ohio 1973) (reversing and remanding for a new trial, where all of the members of the jury read a prejudicial newspaper report concerning the defendant's criminal record, even though each juror indicated the report would not have an effect on the verdict).

In sum, Juror Nine's statements concerned a highly inflammatory and prejudicial prior crime that had been ruled inadmissible. Each of the jurors admitted to hearing at least part of Juror Nine's statements.[24] Their responses during voir

---

[24] This factor distinguishes this case from State v. Samonte, 83 Hawaiʻi 507, 527, 928 P.2d 1, 21 (1996), where this court held that an allegedly tainted jury could nonetheless be impartial. There, two jurors received anonymous letters at their homes during deliberations, urging them to find the defendant guilty and informing them that the defendant had previously been in prison. Id. at 524, 928 P.2d at 18. However, upon examination by the

43

dire indicated that several of the jurors initially viewed the statement as so prejudicial as to affect their impartiality. And, although the circuit court instructed the jury to disregard the statements, the evidence here was not so overwhelming as to outweigh the prejudice of Juror Nine's statements. When viewed alongside the nature of the evidence presented at trial and the statements of some of the jurors during voir dire, Juror Nine's statements were insurmountably prejudicial.

We conclude, based on the totality of the circumstances, that there is a "reasonable possibility" that Juror Nine's statements contributed to Bailey's conviction. See Furutani, 76 Hawaiʻi at 181, 873 P.2d at 60; Tuua, 125 Hawaiʻi at 13, 250 P.3d at 276. Accordingly, Juror Nine's statements were not harmless beyond a reasonable doubt. See id. (holding that, once a rebuttable presumption of prejudice is raised, the prosecution bears the burden of showing the alleged deprivation was harmless beyond a reasonable doubt). Therefore, the circuit court abused its discretion in denying Bailey's motion for a new trial. Cf. Yamada, 108 Hawaiʻi at 482, 122 P.3d at 262 (holding that the circuit court abused its discretion in granting motion

_____

trial court, each of the two jurors indicated that they had not and would not communicate with other jurors concerning the letters. Id. at 524-26, 928 P.2d at 18-20. Each of the two jurors also agreed that they could base their decisions only on the evidence, and could disregard the letters during their deliberations. Id. Based on the totality of the circumstances, this court concluded that the "influence of the letters on the jury was harmless beyond a reasonable doubt." Id. at 527, 928 P.2d at 21.

In contrast, in the instant case, Juror Nine informed all of the other jurors that Bailey had been charged with and/or convicted of murder, and, according to Juror Nine's account, a brief discussion of Bailey's prior criminal record ensued.

for new trial based on juror misconduct, because the misconduct
was harmless beyond a reasonable doubt).

**B.    The jury was properly instructed on the included offense of
attempted sexual assault in the first degree**

Bailey argues that the circuit court erred in
instructing the jury on attempted sexual assault in the first
degree because "[t]here was no ambiguity in the witness' [sic]
testimony by which the jury could rationally conclude that Bailey
had not sexually penetrated MM, but that he had taken a
substantial step in a course of conduct to culminate his sexual
penetration of MM."  Accordingly, Bailey argues, there was no
"rational basis in the evidence" for the instruction.  Id.
Bailey further argues that the ICA's reliance on State v.
Behrendt, 124 Hawai'i 90, 237 P.3d 1156 (2010), is misplaced.

This court has held that "trial courts must instruct
juries as to any included offenses when 'there is a rational
basis in the evidence for a verdict acquitting the defendant of
the offense charged and convicting the defendant of the included
offense[.]'"[25]  State v. Haanio, 94 Hawai'i 405, 413, 16 P.3d 246,
254 (2001) (quoting HRS § 701-109(5) (1993)).  In Haanio, the
defendant was charged with robbery in the first degree, but was
found guilty of the included offense of robbery in the second

_____

[25]    Attempted sexual assault in the first degree is an included
offense of sexual assault in the first degree pursuant to HRS § 701-109(4),
which provides that "[a] defendant may be convicted of an offense included in
an offense charged in the indictment or the information.  An offense is so
included when . . . [i]t consists of an attempt to commit the offense charged
or to commit an offense otherwise included therein[.]"  (Emphasis added).

degree. Id. at 407, 16 P.3d at 248. On appeal, the defendant argued, inter alia, that it was error to instruct the jury on robbery in the second degree because, "if the prosecution's witnesses were to be believed," then the defendant's action could only be considered "intentional," as required on a charge of robbery in the first degree, and not "reckless," as required on a charge of robbery in the second degree. Id. at 410, 16 P.3d at 251 (brackets and internal quotation marks omitted).

This court concluded that the jury instruction was justified. Id. at 413, 16 P.3d at 254. In so doing, this court noted that there was evidence that the defendant may have acted recklessly in inflicting injuries upon the complaining witness. Id. at 417, 16 P.3d at 258. Specifically, this court noted that it reasonably could be inferred that the defendant "was under the influence of intoxicating liquor at the time of the incident[,]" and that he therefore "may have possessed a reckless, rather than an intentional, state of mind with respect to his conduct." Id. This court concluded that the trier of fact "could determine such evidence was of greater weight than evidence supporting the charge that [the defendant] acted intentionally[,]" and thus there was a rational basis in the evidence for giving the lesser included offense instruction. Id.

In Behrendt, this court held that the evidence was sufficient to support giving an instruction on the lesser included offense of sexual assault in the third degree, although

the evidence that was presented was of sexual penetration, which would constitute sexual assault in the first degree.  124 Hawaiʻi at 109-10, 237 P.3d at 1175-76.  This court reasoned:

> a rational juror could have inferred that there was "sexual contact" prior to the penetration, i.e., that there was "touching" of "the sexual or other intimate parts" of [the complaining witness], such as [the complaining witness's] genitalia, buttocks, or other intimate parts, either directly or through clothing, or that [the complaining witness] touched Behrendt's "sexual or other intimate parts."  This testimony, therefore, provided a rational basis to instruct the jury on sexual assault in the third degree, and, when considered in the strongest light for the prosecution, was also sufficient to sustain Behrendt's convictions.

Id. at 110, 237 P.3d at 1176 (citations omitted).

In the instant case, a rational juror could have inferred that Bailey attempted to commit each of the alleged acts of sexual penetration, but did not succeed in doing so.  Although MM and Sandino testified to acts of sexual penetration, the jury was free to reject this testimony.  See State v. Kaleohano, 99 Hawaiʻi 370, 376, 56 P.3d 138, 144 (2002) ("[I]t is for the [finder of fact] to assess the credibility of witnesses . . . and it may accept or reject such testimony in whole or in part.") (citation and quotation marks omitted) (ellipsis in original).  Moreover, as discussed in detail infra, inconsistencies in the testimony, and between MM's testimony and the physical evidence, may have led the jury to question whether the acts of sexual penetration had occurred.

Accordingly, there was a rational basis in the evidence for an instruction on attempted sexual assault in the first degree.  See Behrendt, 124 Hawaiʻi at 110, 237 P.3d at 1176.

## C. There was substantial evidence to support Bailey's convictions on attempted sexual assault in the first degree

Bailey argues that there was not substantial evidence to support his convictions because (1) the testimony of the State's witnesses' was contradictory; (2) MM's testimony was contradicted by "objective physical evidence"; (3) the police could have, but did not, "utilize DNA testing that could have excluded Bailey"; and (4) the jury must have rejected MM's and Uncle's testimony relating to penetration, and there was therefore no basis on which the jury could have concluded Bailey intended to commit "each of [the] specific acts" of attempted sexual assault.  For the reasons set forth below, Bailey's arguments are without merit.

Attempted sexual assault in the first degree is defined by HRS §§ 705-500 and 707-730(1)(b).  HRS § 705-500(1)(b) provides that "[a] person is guilty of an attempt to commit a crime if the person . . . . [i]ntentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime."  HRS § 707-730(1)(b) provides that "[a] person commits the offense of sexual assault in the first degree if . . . [t]he person knowingly engages in sexual penetration with another person who is less than fourteen years old[.]"

Accordingly, in order for Bailey to be found guilty of attempted sexual assault in the first degree, the State was

48

required to prove that (1) Bailey intentionally engaged in conduct; (2) under the circumstances as Bailey believed them to be, the conduct constituted a substantial step in a course of conduct; and (3) Bailey intended that course of conduct to culminate in sexual penetration with MM.  See §§ 705-500(1)(b) and 707-730(1)(b).  Additionally, because the jury was instructed on the offense of attempted sexual assault in the first degree in relation to four specific types of sexual penetration, i.e., penile penetration, digital penetration, cunnilingus, and fellatio, the State was required to prove that Bailey's conduct constituted a substantial step in a course of conduct intended to culminate in each type of sexual penetration with MM.

When viewed in the light most favorable to the State, the evidence is sufficient to support Bailey's convictions.  MM testified that Bailey sexually assaulted her in each of the four ways alleged.  KM testified that he saw MM face down on the floor of the copy room, with Bailey kneeling by her head rubbing oil on her, and both MM and Bailey being fully undressed.  Uncle testified that he saw Bailey "holding [MM's] legs up and licking her vagina[,]" and Uncle also stated that both MM and Bailey were fully undressed.

However, there was also testimony that Uncle told a 911 operator that MM had not been raped.  And, Nurse Endo testified that her report indicated MM had no "obvious [vaginal] injuries," that there were no physical findings, and that there was no

49

injury to MM's hymen.  This testimony arguably contradicted MM's testimony that Bailey inserted his penis "about as much as six inches" into her vagina, and inserted his fingers a "[c]ouple inches" into her vagina.  However, MM was 12 years old at the time she testified, and was sexually inexperienced.  The witnesses' testimony also indicates that the lights in the copy room were off during the alleged acts of sexual penetration, and that Bailey had covered MM's eyes.  Under these circumstances, a reasonable juror may have concluded that MM was mistaken as to the culmination of the acts of sexual penetration, but that Bailey attempted to commit each of the alleged acts described.  Accordingly, the evidence was sufficient "to enable a person of reasonable caution to support a conclusion" that Bailey was guilty on four counts of attempted sexual assault in the first degree, and there was therefore substantial evidence to support Bailey's conviction on each count.  See Kalaola, 124 Hawaiʻi at 49, 237 P.3d at 1115 (discussing the standard for substantial evidence) (quoting Richie, 88 Hawaiʻi at 33, 960 P.2d at 1241); see also State v. Laurie, 56 Haw. 664, 667, 673, 548 P.2d 271, 275, 278 (1976) (concluding that there was substantial evidence to support a conviction for attempted rape in the first degree, where the evidence consisted of medical testimony that the complaining witness (an 18-month-old child) had a tear in her perineum that was "probably caused by a large, blunt object, possibly an erect adult penis").

Bailey argues that inconsistencies in the testimony of the witnesses, and between MM's testimony and the physical evidence, mean that the evidence was not substantial.  However, "it is for the [finder of fact] to assess the credibility of witnesses . . . and it may accept or reject such testimony in whole or in part."  Kaleohano, 99 Hawaiʻi at 376, 56 P.3d at 144 (citation and quotation marks omitted) (ellipsis in original).

Bailey further argues that there was not substantial evidence to support his convictions because the State failed to perform DNA testing that may have exonerated Bailey.  However, assuming DNA evidence would have been relevant in this case,[26] it was not required to support Bailey's convictions.  See State v. Smith, 106 Hawaiʻi 365, 373, 105 P.3d 242, 250 (App. 2004) (rejecting the defendant's argument that there was insufficient evidence to support his conviction for sexual assault in the first degree, where there was insufficient DNA in a vaginal sample to perform an analysis).  Moreover, defense counsel argued to the jury that there was "no legitimate reason for the police not to have conducted that DNA testing" and that the police accordingly did not perform a "[f]ull and fair investigation[.]"  The jury rejected this argument in finding Bailey guilty.  "[I]t

---

[26] Defense counsel conceded that Bailey was found in a "very inappropriate situation" with MM, and thus identity is not disputed.  Also, defense counsel's closing argument and questioning of Detective Artienda appeared to put forth the theory that DNA evidence would have contradicted MM's testimony regarding penetration.  However, Bailey's conviction for attempted sexual assault did not require proof of penetration.  See HRS §§ 705-500 and 707-730(1)(b).

is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." State v. Martinez, 101 Hawaiʻi 332, 340, 68 P.3d 606, 614 (2003) (citation omitted). We do not address what weight the lack of DNA evidence should have carried in this case.

Accordingly, the State presented substantial evidence to support Bailey's convictions.

## IV. Conclusion

Based on the foregoing, we vacate the judgment of the ICA and the circuit court's judgment of conviction and sentence, and remand to the circuit court for a new trial.

Jon N. Ikenaga, Deputy Public Defender, for petitioner/ defendant-appellant.

Michael S. Kagami, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee.

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Simeon R. Acoba, Jr.

/s/ James E. Duffy, Jr.

/s/ Richard W. Pollack

